**AMAX INC. (through AMAX COAL COMPANY, a division), Petitioner,**

**v.**

**STATE BOARD OF TAX COMMIS-SIONERS OF the STATE of INDIANA, Respondent.**

**No. 11T05–8611–TA–00038.**

Tax Court of Indiana.

March 28, 1990.

G. Daniel Kelley, Jr., Barton T. Sprunger, Mark J. Richards, Ice Miller Donadio & Ryan, Indianapolis, for petitioner.

Linley E. Pearson, Atty. Gen. by Ted J. Holaday, Deputy Atty. Gen., Indianapolis, for respondent.

FISHER, Judge.

Amax Inc., (Amax) appeals the State Board of Tax Commissioners' final determination that preparation plant coal washing equipment is not exempt pursuant to IC 6–1.1–10–12. The property was assessed for the years of 1985, 1986, and 1987. This cause is a consolidation of three lawsuits for the three years involved. The coal

washing equipment is the only exemption in dispute in the present case. Other exemptions were claimed by Amax and denied by the Department of Environmental Management (DEM) under IC 6–1.1–10–9. Amax's appeal from the denial of the other exemptions was heard in the case of *Indiana Department of Environmental Management v. Amax, Inc.* (1988), Ind. App., 529 N.E.2d 1209. The Court of Appeals held that Amax was entitled to those exemptions pursuant to IC 6–1.1–10–9. *Id.* at 1214. As a result, this Court will remand, irrespective of the outcome of this case, to the State Board of Tax Commissioners for a full determination of Amax's total assessment for the years of 1985, 1986, and 1987.

During the assessment period, Amax, an Indiana corporation, was in the business of mining and marketing coal. Amax's customers were predominantly electric utility companies located within Indiana. Amax owned three coal mines in Indiana. The mines were located in the Illinois Coal Basin and therefore the coal contained high concentrations of sulfur and ash.

Amax initiated its operations by removing surface layers of soil and rock to expose a coal seam. After the coal was removed from the seam, it was scoured with mechanical brushes and loaded onto a truck which transported the raw coal to a preparation plant. While at the plant, the coal was placed in a rotary breaker crusher to remove impurities. After crushing, the remaining coal was washed. The coal was then shipped directly to the utility customer who paid the transportation costs. The total weight and transportation costs decreased after washing, even though the coal's price per unit increased, because impurities like rock and dirt were removed through the washing and cleaning process prior to transporting. Amax could charge a higher price per ton because the washed coal contained fewer impurities to dilute the pure coal. Amax also charged a higher price to recoup the costs of washing. The transportation costs were calculated after the washing took place.

Unwashed coal generated most of Amax's sales prior to 1970. However, in the early 1970's the federal government imposed stringent air emission standards upon utility companies. One way the utility companies could meet the standards was to burn cleaner coal. Cleaner coal is achieved by washing the coal to remove noncombustible material, including sulfur and ash. At the same time the air emission standards were imposed upon the utilities, Amax began either constructing washing facilities or substantially modifying its existing washing facilities. After Amax installed the new washing facilities, it no longer sold unwashed coal. After the Clean Air Act was passed, Amax's customers no longer demanded unwashed coal.

The Commissioner of the Department of Environmental Management (DEM) denied Amax's request for an exemption for its washing equipment. Subsequently, the State Board of Tax Commissioners reassessed Amax's self-assessment from $17,085,800 to $19,975,850 for the year of 1985; from $19,484,440 to $22,270,810 for the year of 1986; and from $18,738,770 to $21,482,760 for the year of 1987. Part of the increase was due to the State Board's denial of exemptions pursuant to IC 6–1.1–10–12 for the coal washing equipment. The remaining increase was due to the State Board's denial of exemptions under IC 6–1.1–10–9.

Amax contends that it is entitled to an exemption for the coal washing equipment because it has satisfied the requirements of IC 6–1.1–10–12; that the final assessment issued by the State Board is illegal and void because it is contrary to IC 6–1.1–10–12 and 13; and that the final assessment issued by the State Board is not supported by substantial evidence, and is arbitrary and capricious because it denies exemptions which were timely claimed by Amax. Amax also asserts that the property is exempt because the legislature has passed other legislation which provides that coal washing equipment is a pollution control facility. Finally, Amax contends that because a utility company which owns coal washing equipment would be entitled to an exemption, so too should Amax.

The State Board contends that the coal washing equipment used in coal washing or cleaning does not constitute air pollution control systems as defined in IC 6–1.1–10–12 and is not entitled to an exemption. The State Board determined that simply because the federal government or other states recognize coal washing equipment as pollution control systems does not mean that it must recognize the same, and this fact has no relevance to the issue in dispute; and furthermore, the possibility that the washing equipment would be exempt if owned by a utility is irrelevant and undetermined at this time. The State Board also contended during trial that IC 6–1.1–10–12 should be construed narrowly in light of Ind. Const. Art. 10, § 1. Specific findings of the State Board will be provided as necessary.

## ISSUE

Whether the State Board's denial of a tangible personal property tax exemption for washing equipment installed in the early 1970's to wash all the coal sold by Amax is supported with substantial evidence and is not contrary to law, arbitrary and capricious or an abuse of discretion.

## DISCUSSION AND DECISION

The Court will review the State Board's determination to ascertain whether it is made pursuant to proper procedure, is based upon substantial evidence, is not arbitrary and capricious and is not a violation of any constitutional, statutory, or legal principle. *State Bd. of Tax Comm'rs v. Gatling Gun Club, Inc.* (1981), Ind.App., 420 N.E.2d 1324, 1326. The State Board's determination is supported with substantial evidence if a reasonable person could view the record in its entirety and find enough relevant evidence to support the State Board's determination. "Substantial evidence is more than a scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *South Shore Marina, Inc. v. State Bd. of Tax Comm'rs* (1988), Ind.Tax, 527 N.E.2d 738, 742 (quoting *Consolidated Edison Co. v. NLRB* (1938), 305 U.S. 197,

229, 59 S.Ct. 206, 216, 83 L.Ed. 126). An interpretation of a statute that does not comport with legislative intent would be contrary to law. *See Monarch Steel Co. v. State Bd. of Tax Comm'rs* (1989), Ind.Tax, 545 N.E.2d 1148, 1153.

Amax claimed an exemption under IC 6–1.1–10–12, which provides:

Sec 12. Personal property is exempt from property taxation if:

(1) it is part of a stationary or unlicensed mobile air pollution control system of a private manufacturing, fabricating, assembling, extracting, mining, processing, generating, refining, or other industrial facility;

(2) it is not primarily used in the production of property for sale;

(3) it is employed predominantly in the operation of the air pollution control system;

(4) the air pollution control system is designed and used for the improvement of public health and welfare by the prevention or elimination of air contamination caused by industrial waste or contaminants;

(5) a sanitary treatment or elimination service for the waste or contaminants is not provided by public authorities; and

(6) it is acquired for the purpose of complying with any state, local, or federal environmental quality statutes, regulations, or standards.

IC 6–1.1–10–12.

Prior to 1980, a petitioner who sought an exemption under the predecessor to IC 6–1.1–10–12 had to prove that the tangible personal property was (1) an "air purification system," (2) was "not used in the production of property for sale," and (3) was "employed exclusively in the operation of the air purification system." Acts 1965, Ch. 119, § 1. Amendments enacted in 1980 enlarged the scope of the exemption by changing the exemption standard from "exclusively employed" to "employed predominantly," and from "not used in the production" to "not primarily used in the production." IC 6–1.1–10–12. (For purposes of this opinion, the Court will hereinafter re-

fer to the previous statute as the "exclusive use test.")

The regulation implementing the current version of IC 6–1.1–10–12 provides in pertinent part:

(A) STATIONARY OR UNLICENSED MOBILE AIR POLLUTION CONTROL SYSTEM.

Any tangible personal property that is a stationary or unlicensed mobile air pollution control system of a privately-owned manufacturing, fabricating, assembling, extracting, mining, processing, generating, refining, or other industrial facility and employed predominantly in the operation of an air pollution control system designed and used for the improvement of public health and welfare by the prevention or elimination of air contamination caused by industrial waste or contaminants and it is acquired for the purpose of complying with state, local, or federal environmental quality statutes, regulations or standards, may be exempt from taxation subject to the limitations contained herein provided no stationary treatment or elimination facility is made available by public authorities and the stationary or unlicensed mobile air pollution control system is not primarily used in the production of property for sale.

50 I.A.C. 4.1–2–3.

■ IC 6–1.1–10–12 is an exemption statute and therefore must be strictly construed against the taxpayer. *LeSea Broadcasting Corp. v. State Bd. of Tax Comm'rs* (1988), Ind.Tax, 525 N.E.2d 637, 638. "The burden is upon the one claiming the exemption to show that the property clearly falls within the exemption statute." *St. Mary's Medical Center of Evansville, Inc. v. State Bd. of Tax Comm'rs* (1989), Ind.Tax, 534 N.E.2d 277, 281 (quoting *Indiana Ass'n of Seventh–Day Adventists v. State Bd. of Tax Comm'rs* (1987), Ind. Tax, 512 N.E.2d 936). Amax must prove all the requirements set forth in IC 6–1.1–10–12 to obtain an exemption.

■ First, Amax must prove the coal washing equipment was a "stationary or unlicensed mobile air pollution control system." IC 6–1.1–10–12(1). The State Board determined that the coal washing equipment was not a pollution control system because:

[i]f it had been the intent of the Legislature to grant an air pollution control exemption for this type of equipment, it could have very easily amended IC 6–1.1–10–12 to include coal washing, coal cleaning, or coal preparation facilities as qualified air pollution control facilities which would be exempt from personal property taxation when they created IC 36–7–12–2. As an alternative, they could have revised I.C. 6–1.1–10–12 to state that 'air pollution control facilities' shall have the same meaning as defined in I.C. 36–7–2–2.

It is the contention of the State Board that the Legislature merely intended the coal washing facilities to be eligible for financing through the sale of bonds and/or purchase, construct, or lease said facilities from a unit for economic development under IC 36–7–12–2.

1988 Written Findings at 7.

The State Board was correct in stating that IC 6–1.1–10–12 does not provide a definition for an "air pollution control facility." In 1980, when the current version of IC 6–1.1–10–12 was enacted, IC 36–7–12–2 provided: " 'Pollution control facilities' means facilities for the abatement, reduction, or prevention of pollution, or for the removal or treatment of any substances in materials being processed that otherwise would cause pollution when used." IC 36–7–12–2 was amended and recodified in 1985 to provide:

'pollution control facilities' includes land; interests in land; site improvements; infrastructure improvements; buildings; structures; rehabilitation, renovation, and enlargement of buildings and structures; machinery; equipment; and furnishings for facilities for the abatement, reduction, or prevention of pollution, or for the removal or treatment of any substances in materials being processed that oth-

erwise would cause pollution when used. This includes the following:

(1) Coal washing, coal cleaning, or coal preparation facilities designed to reduce the sulfur and ash levels of Indiana coal.

(2) Coal-fired boiler facilities designed to reduce emissions while burning Indiana coal.

(3) Pollution control equipment to allow for the environmentally sound use of Indiana coal.

IC 36–7–11.9–9.

This amendment specifically provides that coal washing equipment is a "pollution control facility." Although IC 36 is not a part of the tax code, but rather, is a provision for economic development, the same legislative intent forms the foundation of IC 36–7–11.9–9 and IC 6–1.1–10–12; an encouragement to contain air pollution. The legislature's encouragement in IC 36 appears in the form of financial assistance. The legislature's encouragement in IC 6–1.1–10–12 appears in the form of a personal property tax exemption.

It also could be argued that IC 36–7–12–2, as it existed in 1980 when IC 6–1.1–10–12 was enacted, did not even provide that coal washing equipment be classified as a pollution control facility, and the 1985 amendment was a change in the law as it existed in 1980. Although there is a presumption when a statute is amended, the legislature intended to change the existing law, *Indiana Department of State Revenue v. Cable Brazil, Inc.* (1978), 177 Ind.App. 450, 459, 380 N.E.2d 555, 559–60, the amendment to IC 36–7–12–2 was instead a clarification because it merely provided examples of air pollution control facilities, a term used previously in 36–7–12–2. Under the predecessor to IC 36–7–11.9–9, the coal washing equipment would qualify as an air pollution control facility. The washing equipment was installed for the abatement, reduction and prevention of air pollution. The washing equipment removed sulfur and ash from the coal, both of which caused air pollution. Therefore, either under IC 36–7–12–2, or IC 36–7–11.9–9, as expressly provided, the coal washing equip-

ment would qualify as a pollution control system.

Other state courts and agencies have also held that coal washing equipment qualifies as a pollution control facility. *Marietta Coal Co. v. Lindley* (1983), 6 Ohio St.3d 6, 450 N.E.2d 1164, 1165. The Illinois Environmental Protection Agency (IEPA) has certified several washers or "scrubbers" as pollution control facilities. *Columbia Quarry Co. v. Dep't of Revenue* (1987), 154 Ill.App.3d 129, 131, 107 Ill.Dec. 52, 54, 506 N.E.2d 795, 797; *Central Illinois Pub. Serv. Co. v. Dep't of Revenue* (1987), 158 Ill.App.3d 763, 764, 110 Ill.Dec. 387, 511 N.E.2d 222.

The State Board's determination that Amax's coal washing equipment is not an air pollution control system is contrary to law.

Second, Amax must prove that the coal washing equipment "is not primarily used in the production of property for sale." IC 6–1.1–10–12(2). Because this part of the statute is most polemic, the Court will reserve analysis for this requirement until it reviews the State Board's findings pertaining to the remainder of IC 6–1.1–10–12.

Third, Amax must prove that the coal washing equipment "is employed predominantly in the operation of the air pollution control system." IC 6–1.1–10–12(3). The State Board found that the coal washing equipment was not "used predominantly in the operation of the air pollution control system" because it was used primarily in the production of property for sale and "to enhance the product and ma[k]e it marketable." Written Findings at 6.

The State Board confuses the requirements of subsections (2) and (3) of IC 6–1.1–10–12. The overwhelming evidence shows that the only function served by the coal washing equipment is that of washing the coal. In the recent case of *Department of Environmental Management v. Amax, Inc.* (1988), Ind.App., 529 N.E.2d 1209, the court examined similar language in IC 6–1.1–10–9, which provides: "an industrial waste control facility means personal property ... (2) used predominantly to: (A) prevent, control, reduce, or elimi-

nate pollution of a stream or public body of water ..." IC 6–1.1–10–9.

In *Amax,* the DEM found that Amax was not entitled to an exemption because the predominant purpose served by the mining reclamation equipment was to enable Amax to comply with federal law, rather than to contain water pollution, and therefore the equipment was not predominantly used for prevention, control, reduction, or elimination of water pollution. *Id.* at 1214. The court found that the denial of the exemption was unreasonable because, *inter alia,* IC 6–1.1–10–9 only required that the property be predominantly, not exclusively, used to prevent pollution. It was not determinative that Amax's purpose for purchasing the equipment was to comply with federal regulations rather than to control water pollution. *Id.*

The court in *Amax* did not expressly define the word "predominantly," but it did consider the following factors found by the trial court as important in its test: (1) that the function was required by federal law, (2) that the equipment was only used for the pollution activity and not in the production of coal, (3) that the activity performed by the equipment was necessary to comply with federal law, and (4) that the government had recognized that the activity performed by the equipment was an effective method of meeting the standards. *Id.* at 1214.

If this same test were applied to the "predominantly employed" language of IC 6–1.1–10–12, the Court would find that even though washing coal was not required by law when the washers were installed, Amax's customers were required to meet federal emissions standards and the only manner in which they could achieve this was to burn cleaner coal. While there were some alternative means of producing cleaner coal, the only feasible and economic way for Amax to sell cleaner coal was to wash it. The only function the washing equipment performed was to wash the coal; it played no other role in the production process.

In the present case, washing the coal was the precise operation that the air pollution control system performed. The washing equipment served no other function but to clean the coal. A reasonable person could not view the record in its entirety and conclude that the coal washing equipment was not used or employed predominantly in the operation of the air pollution control system because, indeed, the coal washing equipment was the air pollution control system.[1] Whether the washing equipment was used primarily for the production of property for sale or primarily used for the control of air pollution will be addressed under the Court's analysis of IC 6–1.1–10–12(2).

The State Board's finding that the washing equipment was not employed predominantly in the operation of the air pollution control system is not supported with substantial evidence and is contrary to law.

Fourth, Amax must prove that "the air pollution control system is designed and used for the improvement of public health and welfare by the prevention or elimination of air contamination caused by industrial waste or contaminants." IC 6–1.1–10–12(4). The State Board found:

> Indiana Code 6–1.1–10–12(4) requires that: '... the air pollution control system (be) *designed* and used for the improvement of public health and welfare by the prevention or elimination

---

**1.** IC 6–1.1–10–36.3(a) provides for purposes of that section:

> property is predominantly used or occupied for one (1) or more stated purposes if it is used or occupied for one (1) or more of those purposes during more than fifty percent (50%) of the time that it is used or occupied in the year that ends on the assessment date of the property.

> The word "predominantly" has also been defined as something that is "reasonably necessary ... and not just related to the exempt purposes."

*St. Mary's Medical Center of Evansville, Inc. v. State Bd. of Tax Comm'rs* (1989), Ind.Tax, 534 N.E.2d 277, 279; *LeSea Broadcasting Corp. v. State Bd. of Tax Comm'rs* (1988), Ind.Tax, 525 N.E.2d 637, 639. Amax's use of the washing equipment would meet these definitions in that the coal washing equipment was used in washing the coal 100% of the time, and the equipment was reasonably necessary in the operation of the air pollution control system because, it was the air pollution control system.

of air contamination caused by industrial waste or contaminants'. The Taxpayer has stated 'the washing process *was not originally devised* as a pollution control process'.

1988 Written Findings at 6.

The Petitioner argues:

[t]he preparation plant washing facilities for which Amax claims [an] exemption were all designed and constructed or substantially modified subsequent to the Federal Clean Air Act of 1970, with the specific intention of reducing sulfur and ash in coal so that Amax's electric utility customers could meet the increasingly stringent clean air restrictions.

Petitioner's Post Trial Brief at 3.

The evidence shows that the coal washing equipment was used to prevent air pollution. When the coal was washed, the ash content would be reduced by as much as sixty (60) percent and sulfur dioxide emissions were reduced by as much as thirty-five (35) percent. Both ash and sulfur cause air pollution.

Evidence of significant changes made to the washing equipment in 1970 was disregarded by the State Board. Amax closed two mines in the early 1970's. Its remaining three mines were designed to serve the Indiana utility industry, an industry which had a demand only for clean coal. Two of the three mines were designed in the early 1970's and part of another mine was substantially modified at that time. At trial, George Land, who is a consultant to Amax, with extensive experience in the coal industry, testified: "[T]hey were designed to do the best they could with that coal to meet a specific utility requirement, which in turn was driven by the Clean Air Act" (R. 26). The State Board only considered part of the evidence when it found that Amax did not meet the requirement of IC 6–1.1–10–12(4) because the coal washing process has existed since the 1920's.

It is true that prior to the enactment of the Clean Air Act, coal was washed to meet local regulations or to enable a producer to charge a higher price for the washed coal. In fact, "the idea of using a current of water to separate heavy material from lighter materials goes back to the gold rush days" (George Land R. 43). George Land also testified that the coal washing equipment now used is substantially more sophisticated than the washing equipment of the past. For example, the washing equipment used today not only washes and cleans the coal, but also controls gravity and separates the coal from the impure rock by using magnetized suspensions (R. 66).

When Amax realized that the Federal Clean Air Act applied to its customers, it either constructed or substantially modified its washing equipment. The State Board's findings that Amax's coal washing equipment was not designed or used for the improvement of public health and welfare by the prevention or elimination of air contamination caused by industrial waste or contaminants is not supported with substantial evidence.

Fifth, Amax must prove that "a sanitary treatment or elimination service for the waste or contaminants is not provided by public authorities." IC 6–1.1–10–12(5). This subsection was not cited as a basis for the State Board's denial of the exemption, therefore, the Court will not address subsection (5) of IC 6–1.1–10–12.

Sixth, Amax must prove that the washing equipment "is acquired for the purpose of complying with any state, local, or federal environmental quality statutes, regulations, or standards." IC 6–1.1–10–12(6). The State Board did not cite to this subsection as a basis for denying the exemption and therefore the Court will not address subsection (6) of IC 6–1.1–10–12. However, the Court notes that the evidence shows Amax's purpose in constructing or modifying the coal washing equipment was to enable its customers to comply with the Federal Clean Air Act of 1970, which the electric utilities have done.

Remaining is the Court's analysis of the State Board's denial of the exemption pursuant to subsection (2) of IC 6–1.1–10–12: "it is not primarily used in the production of property for sale." The State Board contends that the Court must interpret IC

6–1.1–10–12(2) very narrowly in light of the constitutional provision which allows the legislature to provide an exemption for, *inter alia:*

> (1) Property being used for municipal, educational, literary, scientific, religious or charitable purposes;
>
> (2) Tangible personal property other than property being held for sale in the ordinary course of a trade or business, property being held, used or consumed in connection with the production of income, or property being held as an investment.

Ind. Const. Art. 10, § 1.

The State Board asserts that the Indiana Constitution provides an exemption only for property not used, even slightly, in the production of income; and furthermore, the language provided in IC 6–1.1–10–12: "not primarily used in the production of property for sale" must be construed very narrowly in order to comply with Ind. Const. Art. 10, § 1(a)(2). Amax, however, directs the Court to the charitable exemption statutes where language similar to IC 6–1.1–10–12 is used. This Court has previously held that property may be exempt if it is "predominantly" used for religious purposes, even if not "exclusively" used. *St. Mary's Medical Center of Evansville, Inc. v. State Bd. of Tax Comm'rs* (1989), Ind. Tax, 534 N.E.2d 277; *LeSea Broadcasting Corp. v. State Bd. of Tax Comm'rs* (1988), Ind.Tax, 525 N.E.2d 637. This Court will presume that IC 6–1.1–10–12 is constitutional and will follow its plain language as set forth. The State Board has not asserted that any constitutional provision has been violated. *See Video Tape Exchange Co-op of America, Inc. v. Indiana Dep't of Revenue* (1989), Ind.Tax, 533 N.E.2d 1302, 1305. Unless and until a challenge is made to the constitutionality of IC 6–1.1–10–12, the Court's function is to interpret the statute to implement the intent of the legislature. *LeSea,* 525 N.E.2d at 638 (citing *Richey v. Review Bd. of Indiana Employment Sec. Div.* (1985), Ind.App., 480 N.E.2d 968, 973).

The State Board found:

> [the coal washing equipment] is not '... employed *predominantly* in the operation of (an) air pollution control system' (IC 6–1.1–10–9(2)) [sic]; since the equipment is used primarily in the production of property for sale. By its own admission, the Taxpayer could not sell the coal unless it had been washed. Furthermore, the washing process eliminates approximately 30% of the raw coal's tonnage, making the product less expensive to ship to its customers. Impurities such as ash are removed by washing and the BTU's of the coal are increased ... [T]he preparation coal cleaning areas are used predominantly to enhance the product and ma[k]e it marketable.

1988 Written Findings at 6.

The washing process is a part of the production of the coal. "The production process is continuous and indivisible." *Indiana Dep't of State Revenue v. Cave Stone, Inc.* (1983), Ind., 457 N.E.2d 520, 524.

> In an economic sense, production includes all activity directed to increasing the number of scarce economic goods. It is not simply the manual, physical labor involved in changing the form or utility of a tangible article. *Borden Co. v. Borella* (1945), 325 U.S. 679, 683 [65 S.Ct. 1223, 1225, 89 L.Ed. 1865].
>
> 'Production: something that is produced naturally or as a result of labor and effort; the act or process of producing, bringing forth or making; the creation of utility, the making of goods available for human wants.'

*Id.* (quoting *Webster's Third Law International Dictionary* 1810 (unabridged ed. 1971)).

Washing the coal increased its utility to Amax's customers; thus, the washing equipment was used in the production of property for sale. The issue is whether the coal washing equipment was *primarily* used in the production of property for sale.

In order to obtain an exemption Amax must prove that the washing equipment is not "primarily used in the production of

property for sale." Prior to 1980, the statute required that the petitioner prove the personal property was "not used in the production of property for sale." In amending the statute, the legislature expanded the scope of the exemption by inserting the word "primarily." Just how much the legislature intended to expand the exemption can be ascertained by examining the word "primarily."

Other states have used the word "primarily" or "primary" in their respective air pollution control statutes. However, these legislatures have phrased the exemption requirement in a positive form by requiring the petitioner to prove that the equipment is "primarily used" for air pollution control, or that its "primary purpose" is air pollution control. *See Chemical Waste Management, Inc. v. State* (1987), Ala. App., 512 So.2d 115, 116–17; *Ethyl Corp. v. Adams* (1977), Me., 375 A.2d 1065, 1074. In Indiana, a petitioner must prove, *inter alia*, that the equipment is *"not* primarily used in the production of property for sale." IC 6–1.1–10–12(2). Despite the varying phraseology contained in the statutes, the interpretation and definition of the term "primarily" or "primary" is analogous.

Various courts have struggled to define the term. "By far the greatest source of difficulty for courts which have construed statutes similar to the one in question has been in construing the word 'primarily' in the phrase 'acquired or constructed primarily for the control, reduction or elimination of air or water pollution.'" *Chemical Waste*, 512 So.2d at 116.

The Maine Supreme Court examined its air pollution control statute which defined a facility as "any appliance, equipment, ... placed in operation *primarily for the purpose* of reducing, controlling, eliminating or disposing of industrial or other air pollutants." *Statler Indus. v. Board of Envtl.*

*Protection* (1975), Me., 333 A.2d 703, 705–06. In reference to the "primarily for the purpose" language, the court held:

> It is self-evident that tax exemption was not to be extended to pollution control facilities generally but only to those utilized *primarily for the purpose* of pollution abatement. The Legislature has used no language which indicates an intention that the phrase be given a unique or particular meaning. Construed in accordance with common meaning, this phrase connotes a *basic, fundamental* or *principal* purpose as opposed to one which is *secondary* or *merely incidental.* Thus we construe the statutory language as allowing a tax exemption to those pollution abatement facilities which are *basic* or *fundamental* to the control, reduction or elimination of either water or air pollution caused by industrial waste....[T]he legislature sought to reward pollution abatement efforts with tax exemptions but, equally clear, it is the intent to limit such exemption to facilities which *primarily* serve that basic purpose.

*Statler Indus. v. Board of Envtl. Protection* (1975), Me., 333 A.2d 703, 706–07 (emphasis added).

The Maine court equated the word "primarily" to the terms: basic, fundamental, and principal; and contrary to the terms: secondary, or merely incidental. To obtain an exemption, Amax must prove that the washing equipment is not fundamental, basic, or principal to the production of property for sale, but is instead, merely incidental or secondarily used in the production of property for sale.

Amax stated that it could not sell its coal unless it had been washed. This statement was one of the main reasons why the State Board denied the exemption under IC 6–1.-1–10–12(2).[2] However, Amax produced and

---

**2.** According to the court in the case of *Marietta Coal Co. v. Lindley* (1983), 6 Ohio St.3d 6, 450 N.E.2d 1164, Amax's statement would support the State Board's denial of the exemption under IC 6–1.1–10–12(2). The Ohio court found that the coal company's scrubber qualified for an air pollution control certificate because, *inter alia,*

Marietta was not required to wash its coal in order to produce a saleable product. *Id.* at 7, 450 N.E.2d at 1166. However, the Ohio court's holding is not applicable to the present case because the Ohio statute imposes a more stringent, *"exclusive* use" requirement upon a petitioner, rather than the "not *primarily* used" test

sold coal long before it installed the washers for which it now claims exemption. If the washing equipment really were primarily used in the production of property for sale, or were basic, fundamental, or principal to the production of the coal, the washing equipment would have been installed long before the enactment of the Federal Clean Air Act. Instead, Amax produced coal for years prior to the Act's passage without this washing system.

The washing equipment is much like the precipitators, filters, and smoke stacks, described by the court in the case of *Illinois Cereal Mills, Inc. v. Department of Revenue* (1976), 37 Ill.App.3d 379, 346 N.E.2d 69. The court held:

> 'sold or used or intended for the primary purpose of' reducing or eliminating certain types of pollution does not seem to refer to equipment like the gas fired boilers even though they were installed because they were less polluting than the equipment formerly used. Rather the words refer to equipment such as precipitators, filters, and smoke stacks *which have no substantial function in the manufacturing or processing of a product other than to abate the pollution caused by the plant operation.*

*Id.* at 381–82, 346 N.E.2d at 71 (emphasis added).

The court held that the primary purpose or reason for installing the boilers was to produce steam in the manufacturing process and not for the control of air pollution. *Id.* at 380, 346 N.E.2d at 70.

The coal washing equipment has no other effect on the coal but to make it cleaner. It serves no other function in the production process such as producing steam or heat to improve productivity.[3] The coal does become more valuable after the washing process because it contains a higher percentage of BTU's (heat units) and because Amax's utility customers are able to meet the standards set by the EPA. How-

ever, this does not mean that the washing equipment is primarily used in the production of property for sale. Almost any facet of the production process will, at least, marginally, increase the value of the end product; a fact recognized by the Indiana legislature when it used the phrase "not *primarily* used in the production of property for sale." The purpose of IC 6–1.1–10–12(2) is to prevent the exemption of property that is installed for its use primarily in the production of property for sale, rather than for its use in the control of air pollution.

■ The washing equipment is fundamental, basic, principal, or primarily used in the control of air pollution. Without this washing equipment, Amax's coal would not be washed, and impurities that produce air pollution would not be removed. Without this washing equipment, Amax could not enable its customers to meet the air emission standards set by the EPA. Although the test imposed by IC 6–1.1–10–12(2) is not whether the washing equipment is primarily used in the control of air pollution, but rather, is whether the washing equipment is "primarily used in the production of property for sale," once the Court finds that the equipment is primarily used in the control of air pollution, it must necessarily find that the equipment is not primarily used in the production of property for sale. "If, as will often be the case, a facility is 'installed, acquired or placed in operation' for *multiple* purposes, only one of these can, by definition, be characterized as *primary*." *Ethyl Corp. v. Adams* (1977), Me., 375 A.2d 1065, 1075. If the equipment is primarily used to control air pollution, it cannot be primarily used in the production of property for sale; only one use can be primary, the other use must necessarily be secondary.

The Court finds that the coal washing equipment was not primarily used in the production of property for sale. The find-

---

applied in Indiana. *Id.* at 8, 450 N.E.2d at 1167 (emphasis added).

**3.** Although the washing equipment serves the function of separating the coal from various

impurities, this function is part of the washing and cleaning process, and not a separate production function.

ing of the State Board does not comport with the legislative intent of IC 6–1.1–10–12(2) and is contrary to law.

The Court therefore finds that the determination of the State Board of Tax Commissioners denying the exemption pursuant to IC 6–1.1–10–12 is contrary to law and is not supported with substantial evidence. Accordingly, the Court reverses the determination of the State Board of Tax Commissioners, and this cause is remanded for further action in accordance with this opinion.