CLARK–PLEASANT COMMUNITY
SCHOOL CORPORATION,
Petitioner,

v.

DEPARTMENT OF LOCAL
GOVERNMENT FINANCE,
Respondent.

No. 49T10–0805–TA–37.

Tax Court of Indiana.

Dec. 2, 2008.

Publication Ordered Jan. 15, 2009.

George E. Purdy, Kelly M. Scanlan, Bose McKinney & Evans LLP, Indianapolis, In, Attorneys for Petitioner.

Steve Carter, Attorney General of Indiana, Andrew W. Swain, Chief Counsel, Tax Section, John D. Snethen, Deputy Attorney General, Indianapolis, IN, Attorneys for Respondent.

Gretchen K. Gutman, Geoffrey G. Slaughter, Taft Stettinius & Hollister LLP, Indianapolis, IN, David R. Day, Séamus P. Boyce, Alexander P. Pinegar,

Church Church Hittle & Antrim, Fishers, IN, Amici Curiae for Petitioner.

John R. Price, Price Owen Law, Indianapolis, IN, Amicus Curiae for Respondent.

FISHER, J.

On April 8, 2008, the Department of Local Government Finance (DLGF) rejected a lease rental agreement between the Clark–Pleasant Community School Corporation (the School Corporation) and the Clark–Pleasant Middle School Building Corporation (the Building Corporation) providing for the construction of a new middle school and renovations to the existing middle school and high school. The School Corporation now appeals.

## FACTS AND PROCEDURAL HISTORY

The School Corporation, located 20 minutes south of Indianapolis in Johnson County, Indiana, serves a geographic district of approximately 56 square miles. The district is comprised primarily of a residential, as opposed to a commercial, tax base. The School Corporation currently operates one high school (grades 9 through 12), one middle school (grades 7 and 8), one intermediate school (grades 5 and 6), four elementary schools (kindergarten through grade 4), and the Clark Pleasant Academy.[1] The School Corporation is also in the process of constructing a fifth elementary school.

In 2005, the School Corporation was faced with the challenge of physically accommodating its rapidly growing student body: the high school was over-capacity and the School Corporation was using portable classrooms to facilitate student instruction; the intermediate school and all four of the elementary schools were at capacity. With enrollment projected to increase by another 350 to 400 new students per year for the next ten years, the School Corporation commissioned a task force, comprised of both members of its staff and the community at large, to assist it in developing a construction plan to accommodate that enrollment growth. The task force met 22 times to review and suggest options on how to best accommodate the enrollment growth. The School Corporation also conducted six public forums to gather community input. The School Corporation ultimately decided that it would best serve both the immediate and projected needs of the district if it converted the current middle school into a high school annex to house all ninth-graders, constructed a new middle school, and made certain minor renovations to the existing high school (the proposed project). The total cost of the proposed project was $60,000,000.

On February 22, 2007, the School Corporation conducted a public hearing on the proposed project, giving taxpayers the opportunity to ask questions or voice concerns. Two people spoke out against the project. At the conclusion of the hearing, the School Corporation voted unanimously to proceed with the proposal.[2] The School

---

1. "Clark Pleasant Academy accommodates students who are currently enrolled at Whiteland Community High School. Priority is given to junior and senior students who have [been] ... referred to the Academy by their high school guidance counselor and then approved by the high school principal." *www.cpcsc.k12.in.us/academy/* (follow "About the Academy" hyperlink).

2. The School Corporation also agreed to meet personally with the two dissenters to discuss the project further. After meeting several times over the course of the next thirty days, the School Corporation and the two dissenters "[u]ltimately[ ] agreed to disagree" as to the propriety of the proposed project. (Cert. Admin. R. at 10.)

Corporation published notice of its decision on February 23, 2007.

In March of 2007, opponents of the proposed project initiated a remonstrance process as provided by statute. The remonstrance process failed, however, as only 1,513 petitions against the project were filed, opposed to the 2,740 petitions favoring the project. The Johnson County Auditor certified these results on July 5, 2007.

The School Corporation subsequently moved forward with its plans and approved a proposed lease rental agreement. On October 12, 2007, the School Corporation petitioned the DLGF to approve the execution of the lease, which provided that the School Corporation would make annual rental payments of $4,905,000 to the Building Corporation over the course of 27 years for the proposed project. The DLGF referred the petition to the School Property Tax Control Board (Control Board) for its recommendation.

On November 15, 2007, the Control Board conducted a hearing on the matter. Comments from both proponents and opponents of the proposed project were heard.[3] After a vote, the Control Board recommended that the DLGF approve the lease rental agreement.

On February 6, 2008, the Commissioner of the DLGF, Cheryl Musgrave (Musgrave), sent letters to each member of the School Corporation's school board. Musgrave's letters urged the School Corpora-

tion to meet with the remonstrators again "to bridg[e] the gap that currently exists." (See Cert. Admin. R. at 362–69.) The School Corporation subsequently declined Musgrave's request, explaining that it had met with project remonstrators numerous times throughout the entire process and believed it had done all that it was statutorily required to do. (See Cert. Admin. R. at 431–32.) On April 8, 2008, the DLGF rejected the lease rental agreement.

On May 21, 2008, the School Corporation filed this original tax appeal.[4] The Court conducted a hearing on the matter on October 24, 2008. Additional facts will be supplied when necessary.

## ANALYSIS AND OPINION

■ When the DLGF reviews school construction projects, it does so as a tax specialist. See, e.g., Graber v. State Bd. of Tax Comm'rs, 727 N.E.2d 802, 806 (Ind. Tax.Ct.2000), review denied; Boaz v. Bartholomew Consol. Sch. Corp., 654 N.E.2d 320, 325–26 (Ind. Tax Ct.1995); Bell v. State Bd. of Tax Comm'rs, 651 N.E.2d 816, 819–20 (Ind. Tax Ct.1995). Thus, the DLGF's function is not to pass judgment on how a school corporation chooses to educate its students; rather, its function is to analyze, from a tax standpoint, the school corporation's need for capital construction in light of its chosen educational programs and policies. See Graber, 727 N.E.2d at 808–09; Boaz, 654 N.E.2d at 325–26; Bell, 651 N.E.2d at 819–20. To

3. One of the opponents of the proposed project, Mr. Tad Bolson, testified to a variety of concerns: that the School Corporation had already spent too much money on other projects; that because of the district's limited commercial base, residential taxpayers were disproportionately bearing the burden of any new construction; that cheaper architectural firms could be engaged for the project; that the district's tax rate was already too high; that the construction of another elementary

school and the renovation of the existing high school was a better option to pursue; and that the School Corporation had misled taxpayers as to the impact the new construction would have on their tax liabilities. (See Cert. Admin. R. at 23–38, 532–64.)

4. The DLGF subsequently filed two separate motions to dismiss the case. The Court has disposed of those motions in a separate order.

that end, Indiana Code § 20–46–7–11 requires the DLGF to consider the following factors when determining whether or not to approve a school building construction project:

(1) The current and proposed square footage of school building space per student.

(2) Enrollment patterns within the school corporation.

(3) The age and condition of the current school facilities.

(4) The cost per square foot of the school building construction project.

(5) The effect that completion of the school building construction project would have on the school corporation's tax rate.

(6) Any other pertinent matter.[5]

IND.CODE ANN. § 20–46–7–11 (West 2008) (footnote added).

On appeal, the School Corporation argues that while it presented evidence as to all these statutory factors which weighed in the proposed project's favor, the DLGF still rejected it. The School Corporation claims that the DLGF's final determination is not supported by the evidence and therefore constitutes an abuse of discretion. The DLGF maintains, on the other hand, that it was within its statutory discretion to deny the proposed project and, as a result, its final determination was proper.

■ Indiana Code § 20–46–7–11 does not require the DLGF to assign greater weight to any one of the statutorily listed factors, nor does the DLGF have to consider any single factor dispositive. *See*

*Graber,* 727 N.E.2d at 807.[6] Rather, all that is required by the DLGF is that it consider each of the listed factors, though it does not have to base its ultimate decision on them. *See id.* Consequently, this Court will give deference to whatever factor or reason the DLGF bases its final determination on as long as the DLGF's reasoning is supported by substantial evidence. *See Huffman v. Office of Envtl. Adjudication,* 811 N.E.2d 806, 809 (Ind. 2004) (citations omitted); *Filter Specialists, Inc. v. Brooks,* 879 N.E.2d 558, 571 (Ind.Ct.App.2007) (citation omitted). Substantial evidence means " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Amax Inc. v. State Bd. of Tax Comm'rs,* 552 N.E.2d 850, 852 (Ind. Tax Ct.1990) (citation omitted).

■ When the School Corporation presented its proposed project to both the public at large and the Control Board, it presented evidence addressing each of the statutory factors in Indiana Code § 20–46–7–11. First, it presented evidence demonstrating that its current—and projected—enrollment required additional classroom facilities. (Cert. Admin. R. at 2–16, 375–98, 405.) Indeed, the School Corporation explained that between 1997 and 2007, its total student enrollment had nearly doubled from 2,900 to 5,600. As a result of this explosive growth, its high school was currently over-capacity and using portable classrooms to accommodate the student body; furthermore, its intermediate and elementary schools were all at capacity. Based on residential construction trends, the School Corporation estimated that an-

---

**5.** These same factors are to be considered by the Control Board when it makes its recommendation to the DLGF to either approve or disapprove the project. IND.CODE ANN. § 20–46–7–11 (West 2008).

**6.** The Court notes that *Graber* analyzes a different, but identical, statute. *See Graber v. State Bd. of Tax Comm'rs,* 727 N.E.2d 802, 806–07 (Ind. Tax Ct.2000). It is therefore reasonable to apply that statute's construction to Indiana Code § 20–46–7–11.

other 350 to 400 new students would be added each year to the student body through 2017.

Second, the School Corporation explained that while nearly every one of its existing facilities had been renovated within the last eight years for the purpose of finding room to accommodate its growing student body (and were therefore in very good to excellent condition), it *still* did not have enough space for the students. As a result, it examined various renovation/construction project options to deal with the enrollment growth. (Cert. Admin. R. at 4–16, 405.) After receiving community input and examining the viability of all its options, the School Corporation decided that the proposed project would best meet both the immediate and future needs of the district.

Next, the School Corporation presented evidence demonstrating that the costs of the proposed project fell within established DLGF guidelines. (*See* Cert. Admin. R. at 8, 12, 14–15, 17, 72–74, 110–45, 163, 171, 211.) For example, the new 280,000 square foot middle school, with a 1,600 student capacity, was projected to cost a total of $48,470,568. Accordingly, the new middle school would run $154.75 per square foot in construction costs and $173.11 per square foot in total project costs, whereas the DLGF's established guidelines provided that the costs should be between $157 and $189 per square foot.[7]

Finally, the School Corporation presented evidence that the proposed project would essentially have no effect whatsoever on the district's tax rate. (*See* Cert. Admin. R. at 10–11, 87, 279.) Indeed, the School Corporation explained that due to recently updated (and increased) assessed valuations within the district, as well as the fact that the School Corporation would be retiring some of its existing debt, there would be no impact on the district's current tax rate.

For the most part, the DLGF's final determination merely reiterates the procedural background that has taken place in this case and describes the aforementioned evidence presented by the School Corporation. (*See* Cert. Admin. R. at 406–14.) The DLGF did, however, make the following additional "findings" before it denied the lease rental agreement:

"The school corporation did not modify any part of the project to address taxpayer concerns raised during the petition/remonstrance process[;]"

"Tad Bohlson [sic], a taxpayer opposed to the project who was a member of the task force[ ] stated at the Control Board hearing that he believed there was a better option[;]"

"A comparison of other middle school projects indicates that the cost of [the School Corporation's] proposed new middle school is high compared to other projects[;]"

"[I]n 2005, Clark–Pleasant officials predicted as many as 8,800 new housing units could be built over the next decade in the school district. However, after home building slowed in the district, that expectation was scaled back to about 4,600 units[;]"

"Clark–Pleasant currently has a high total tax rate; thus, maintaining the current tax rate and arguing that [the proposed project will have] a minimal impact on taxpayers is not persuasive[;]"

---

**7.** The School Corporation provided similar figures for the renovation portions of the proposed project.

"The Department attempted to 'bridge the gap' between the remonstrators and the School [Corporation] by requesting that both sides meet to discuss the project and attempt to find any common ground on a modified proposal. Unfortunately, the School [Corporation] refused the Department's request."

(Cert. Admin. R. at 406–13 ¶¶ 13(b), 14, 18, 19, 21(g), 22.) Accordingly, the Court concludes that the DLGF denied the School Corporation's proposed project for four reasons: 1) the cost of the new middle school was too high compared to other projects; 2) the growth in the new home construction market was slower than anticipated; 3) the school district's current tax rate is too high; and 4) the School Corporation did not modify the proposed project to address the remonstrators' concerns. These reasons, however, are not supported by the evidence.

In stating that the new middle school's cost was too high compared to other projects, the DLGF's final determination merely lists four other middle schools, built in 2007, their construction costs and square footages. (*See* Cert. Admin. R. at 411–412.) In doing the math, however, the costs for each of those schools range from $190 per square foot to $244 per square foot—much higher than the $173 per square foot for the School Corporation's middle school. (*See* Cert. Admin. R. at 411–412.) Consequently, without any further explanation, the DLGF's comparison simply does not allow the conclusion that the subject middle school's cost is too high compared to other projects.

Next, the DLGF's final determination states "[t]wo years ago, Clark–Pleasant officials predicted as many as 8,800 new housing units could be built over the next decade in the school district. However, after home building slowed in the district, that expectation was scaled back to about 4,600 units." (*See* Cert. Admin. R. at 412.) As support for this statistic, the DLGF relies on an October 18, 2007 article written by *The Daily Journal,* a Johnson County online newspaper. (*See* Cert. Admin. R. at 412, 475–76.) Because the DLGF provided no further reasoning, the Court presumes the DLGF has made the inference that with fewer new homes being built, fewer new students will be enrolled and therefore the need for additional classroom space is not warranted.[8]

The accuracy of this statistic is not challenged. Nevertheless, if one reads the article *in its entirety,* it is does not rebut the School Corporation's evidence that enrollment is still projected to increase by 350 to 400 new students each year for the next ten years: indeed, the article is captioned "[Clark–Pleasant] projected to grow by 42 percent [by 2017.]" (*See* Cert. Admin. R. 475.) Furthermore, the article explains that "[f]or every 100 homes built, an average of 110 children enter the school system[.]" (Cert. Admin. R. at 476.) Assuming that 460 new units are built each year over the course of the next ten years (for a total of 4,600 units), the School Corporation is looking at approximately 500 new students each year. Thus, the article does not support the DLGF's conclusion.

The DLGF's third reason for denying the proposed project is because the district's tax rate is already "too high." As support for this conclusion, the DLGF's final determination states:

8. If this was not the inference the DLGF intended, however, it should have been more explicit in its final determination. Indeed, if there are any inferences to be made from the evidence upon which the DLGF relies, it is up to the DLGF to explain its reasoning *in its final determination* and cite to the evidence that supports its reasoning.

Of the five school districts in Johnson County, Clark[-]Pleasant is the only school district ... with a tax rate over $2.00. In fact, with its current tax rate of $2.1391, Clark–Pleasant's tax rate is 29 cents higher than the school district with the second highest tax rate in the county, Franklin Community Schools ($1.8470).

Clark–Pleasant's debt service fund has a current tax rate of $0.8371, which is over 15 cents higher than the school district with the second highest debt service rate in the county, Franklin Community Schools ($0.6803).

Clark–Pleasant is the only school district in Johnson County with a debt service tax rate ($0.8371) and levy ($9,724,218) higher than their general fund tax rate ($0.6823) and general fund levy ($7,925,-976). Additionally, Clark–Pleasant is only 1 of 24 school districts in the state out of 293 school districts, which has a debt service tax rate higher than their general fund tax rate.

Clark–Pleasant's assessed valuation of $1,161,655,510 is comparable to Franklin Community School Corporation's assessed valuation of $1,275,814,520 and Greenwood community School Corporation's assessed valuation of $1,100,913,520. Yet Franklin schools and Greenwood schools have a total tax rate and debt service tax rate significantly less than Clark–Pleasant.

Clark–Pleasant has the 13th highest school district tax rate out of 326 school district tax rates in Indiana.

The total debt to assessed value ratio, including the proposed new $60,000,000 debt, is 15.61 %.

(Cert. Admin. R. at 412–13 ¶¶ 21(a)-(f).) [9] These "comparisons," however, carry little meaning within the context of this case.

To conclude that the School Corporation's tax rates are "too high" when compared to say, Franklin Community Schools (hereinafter, the Franklin School Corporation), all other factors must essentially be the same. In other words, evidence needs to be presented demonstrating that the Franklin School Corporation has experienced the same population/enrollment growth as the School Corporation. Similarly, evidence regarding Franklin School Corporation's previous construction projects needs to be presented.[10] Finally, evidence as to the comparability of the Franklin School Corporation's tax base is pertinent: is it primarily residential, or is the tax burden distributed more evenly amongst commercial and industrial properties? Only with this information can an accurate comparison be made. Here, however, this information is not revealed in the record. As a result, the DLGF's "comparisons" are not supported by the evidence.

Finally, the DLGF has cited the School Corporation's failure to "bridge the gap" with the remonstrators as a reason for denying the proposed project. It is within the DLGF's discretion to consider the level of community support for the proposed project. *See* A.I.C. § 20–46–7–11(6); *Boaz*, 654 N.E.2d at 324. In exercising that discretion, however, the DLGF went too far.

---

**9.** The Court notes the DLGF's discrepancy in referring first to the 293 school districts within the state, and then later to the 326 school districts within the state.

**10.** If the Franklin School Corporation has had no new school construction/renovation projects whatsoever within the last eight years, one could actually conclude that its tax rates are high when compared to those of the School Corporation.

After much research and deliberation, the School Corporation selected the proposed construction project it believed best met its enrollment and educational needs. Throughout that entire selection process, district taxpayers had numerous opportunities to voice their concerns and provide their input as to the propriety of the School Corporation's selection. Those opportunities culminated in the remonstrance process provided by statute—the taxpayers' formal opportunity to stop the project. *See Huntington County Comty. Sch. Corp. v. State Bd. of Tax Comm'rs*, 757 N.E.2d 235, 238–40 (Ind. Tax Ct.2001); *Boshart v. State Bd. of Tax Comm'rs*, 672 N.E.2d 499, 501 (Ind. Tax Ct.1996). The remonstrance process failed, however, as the taxpayers who were opposed to the proposed project "failed to convince a sufficient number of their neighbors [as to] the wisdom of their position." *Boshart*, 672 N.E.2d at 501. At that point, the School Corporation's choice to build a new middle school and renovate the current middle and high schools as its preferred means to meet its enrollment needs was no longer subject to debate by the taxpayers. *See id.* (stating that a school corporation need not entertain further legal protests or objections from taxpayers beyond the remonstrance).

The DLGF may very well believe that the School Corporation should have done more to "bridge the gap" with the remonstrators. Nevertheless, the DLGF was required to review the proposed project *from a tax standpoint.* It was not within the DLGF's authority to give the remonstrators a second bite at the apple. *See*

*Huntington County Cmty. Sch. Corp.*, 757 N.E.2d at 238–41.

## CONCLUSION

This Court will give deference to whatever factor or reason the DLGF bases its final determination on as long as the DLGF's reasoning is supported by the evidence. Here, the DLGF's reasoning is not supported by the evidence and, as a result, the DLGF's final determination must be REVERSED. The matter is hereby REMANDED for a final determination to be issued consistent with this opinion.

## *ORDER*

The Petitioner, by counsel, files "Motion to Publish Decision."

The Court, having considered same and being duly advised in the premises, now finds said motion should be GRANTED.

IT IS THEREFORE ORDERED as follows:

1. Petitioner's "Motion to Publish Decision" is granted and this Court's decision heretofore handed down in the case of *Clark–Pleasant Community School Corporation v. State of Indiana, Department of Local Government Finance*, 49T10–0805–TA–37 (Ind. Tax Ct., December 2, 2008) marked "Not For Publication" is now ordered published.