MEADOWBROOK NORTH APART-
MENTS, an Indiana Limited
Partnership, Petitioner,

v.

Brenda CONNER, Assessor of
Noble Township, Wabash
County, Respondent.

No. 49T10–0203–TA–35.

Tax Court of Indiana.

Aug. 4, 2005.

Ordered Published Oct. 3, 2006.

Brent A. Auberry, Vickie L. Norman, Baker & Daniels, Indianapolis, IN, for Petitioner.

Steve Carter, Attorney General of Indiana, Linda I. Villegas, Deputy Attorney General, Indianapolis, IN, for Respondent.

FISHER, J.

Meadowbrook North Apartments, an Indiana Limited Partnership (Meadowbrook), appeals the Indiana Board of Tax Review's (Indiana Board) final determination valuing its real property as of March 1, 1995. The sole issue for the Court to decide is whether Meadowbrook is entitled to an adjustment to account for economic obsolescence.[1] For the following reasons, the Court REVERSES the Indiana Board's final determination.

## FACTS AND PROCEDURAL HISTORY

Meadowbrook owns and operates a subsidized housing complex (complex) in Wabash County, Indiana, which was developed under the U.S. Department of Housing and Urban Development's (HUD) 236 Program. The 236 Program is a mortgage interest subsidy program designed as a means to encourage developers to produce below-market housing for low-income individuals. Consequently, HUD determines the maximum rent chargeable for each housing unit based upon the complex's operating expenses and Meadowbrook's mortgage debt and dividend equity. While the 236 Program does not entitle Meadowbrook to any federal tax incentives, it does entitle it to a monthly reduction in its mortgage interest payments and a limited return on investment.[2]

As of the March 1, 1995 assessment date, the township assessor (Assessor) fixed the assessed value of the complex at $611,100. In arriving at that value, the Assessor did not assign an economic obsolescence adjustment to the complex. On March 27, 1996, Meadowbrook challenged its assessment by filing a Petition for Review of Assessment (Form 130) with the Wabash County Board of Review (BOR). In its final determination, the BOR reduced the assessed value of the complex, but affirmed the Assessor's denial of an obsolescence adjustment.

Still believing its assessment to be too high, Meadowbrook appealed to the State Board of Tax Commissioners (State Board) by filing a Petition for Review of Assessment (Form 131). In its Form 131, Meadowbrook alleged, among other things, that the apartment complex suffered from obsolescence as a result of the HUD-imposed rent restrictions. The State Board conducted an administrative hearing on

1. Meadowbrook also contends that the Indiana Board violated its due process rights when it relied upon *ex parte* evidence not presented at the administrative hearing. Given the decision of the Court herein, it is unnecessary for the Court to address this issue.

2. Although the 236 Program allows developers to receive a 6% return on investment, any overage must be sent to the mortgage company for placement in a reserve account. *See In re Appeal of Pend O'Reille Village Apts.*, No. 94-A-6542, 1995 WL 65437, at *1 (Idaho Bd. Tax App. Feb. 16, 1995) (describing HUD 236 Program). Moreover, while the 236 Program did provide tax incentives to developers at one time, under the Tax Reform Act of 1986, any tax incentives the developers were to receive were abolished. *See id.* at *2.

Meadowbrook's Form 131 petition on October 13, 2000. On February 8, 2002, the Indiana Board of Tax Review (Indiana Board) issued a final determination denying Meadowbrook's request for relief.[3] Meadowbrook subsequently filed a Request for Rehearing with the Indiana Board, which was ultimately denied.

On March 21, 2002, Meadowbrook filed an original tax appeal. On April 14, 2003, this Court heard the parties' oral arguments. Additional facts will be supplied as necessary.

## ANALYSIS AND OPINION

### Standard of Review

■ This Court gives great deference to final determinations of the Indiana Board when it acts within its scope of authority. IND.CODE ANN. § 33–26–6–3(b) (West 2005). *See also Meridian Towers East & West v. Washington Township Assessor*, 805 N.E.2d 475, 477 (Ind. Tax Ct.2003) (citation omitted). Consequently, the Court will reverse a final determination of the Indiana Board only if it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

IND.CODE ANN. § 33–26–6–6(e)(1)—(5) (West 2005).

■ The party seeking to overturn the Indiana Board's final determination bears the burden of proving its invalidity. A.I.C. § 33–26–6–6(b). *See also Meridian Towers*, 805 N.E.2d at 477. In order to meet that burden, the party seeking reversal must have submitted, during the administrative hearing process, probative evidence regarding the alleged assessment error. *Osolo Township Assessor v. Elkhart Maple Lane Assocs. L.P.*, 789 N.E.2d 109, 111 (Ind. Tax Ct.2003) (footnote and citations omitted). Probative evidence is evidence sufficient to establish a given fact that, if not contradicted, will remain sufficient. *Id.* at n. 4. Once the party seeking reversal demonstrates a prima facie case, the burden shifts to the other party to rebut that evidence. *See Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d at 1230, 1233 (Ind. Tax Ct.1998) (citation omitted) ("*Clark* I").

### Discussion

Meadowbrook contends that the Indiana Board refused to meaningfully consider its evidence when it upheld the Assessor's denial of an economic obsolescence adjustment to its property. Specifically, Meadowbrook maintains that it made a prima facie case in that it "submitted probative evidence, consisting of an income analysis based on generally recognized appraisal principles, along with supporting documents and expert testimony, demonstrating that the [complex] suffered from, at minimum, 31% economic obsolescence[.]" (Pet'r Br. at 4.) In turn, Meadowbrook

---

**3.** On December 31, 2001, the legislature abolished the State Board of Tax Commissioners (State Board). 2001 Ind. Acts 198 § 119(b)(2). Effective January 1, 2002, the legislature created the Indiana Board of Tax Review (Indiana Board) as "successor" to the State Board. IND CODE ANN. §§ 6–1.5–1–3; 6–1.5–4–1 (West Supp.2004–2005); 2001 Ind. Acts 198 § 95. Thus, when the final determination was issued on Meadowbrook's appeal, the Indiana Board issued it.

argues that the Assessor failed to offer any evidence to rebut its claim. The Court agrees.

Obsolescence, a form of depreciation, is the functional or economic loss of property value expressed as a percentage reduction in the remaining value of the subject improvement. IND. ADMIN. CODE tit. 50, r. 2.2–10–7(e), (f) (1996). *See also Meridian Towers*, 805 N.E.2d at 477–78 (citation omitted). Functional obsolescence is caused by factors internal to the property and is evidenced by conditions within the property itself whereas economic obsolescence is caused by external factors. 50 IAC 2.2–10–7(e).

■■■■ In order to establish a prima facie case for obsolescence, a taxpayer must (1) identify factors that are causing obsolescence, and (2) quantify the amount of obsolescence to which it believes it is entitled. *Clark* I, 694 N.E.2d at 1241 (footnote omitted). The taxpayer must relate the factors (and therefore the quantification) of obsolescence to an actual loss in property value. *See Miller Structures, Inc. v. State Bd. of Tax Comm'rs*, 748 N.E.2d 943, 953–54 (Ind. Tax Ct.2001). In the commercial context, actual loss corresponds to a reduction in an improvement's income generating ability. *Id.* at 953 (citations omitted).

## I. Meadowbrook's Causes of Obsolescence

■■■■ Although the regulations list various causes of economic obsolescence, they do not reference the impact of restrictions placed on federally subsidized housing units. *See* 50 IAC 2.2–10–7(e). The list, however, is illustrative, not exhaustive.

*See Clark v. State Bd. of Tax Comm'rs*, 742 N.E.2d 46, 51 (Ind. Tax Ct.2001) ("*Clark* II") (citation omitted), *review denied.* Meadowbrook asserts that, due to the governmentally imposed restrictions of the 236 Program, its potential rental market is limited, and it has higher operating costs than comparable unrestricted properties because of high turnover, additional record keeping and other HUD requirements. (Cert. Admin. R. at 261–62, 264.) In addition, Meadowbrook maintains that HUD restricts any returns on investment to which it may be entitled, sets the maximum rents charged to tenants, and prohibits it from paying off the mortgage without HUD approval. (Cert. Admin. R. at 262–63.) Consequently, Meadowbrook asserts that its income producing ability is limited.

At the administrative level, Meadowbrook presented a report (Report) to support its contention that it sufficiently identified and linked these causes of obsolescence to its reduced ability to generate income. The Report, prepared by Brian Poore, an associate Member of the Appraisal Institute (MAI) and Level II Certified Indiana Assessor–Appraiser (Appraiser), included, among other things, copies of eighteen State Board final determinations illustrating that the State Board had previously granted obsolescence adjustments to subsidized housing complexes; a summary of Meadowbrook's income and expenses; a HUD-issued statement of Meadowbrook's profit and loss for 1992–1994; and a rent schedule and a rent comparability study. (*See* Cert. Admin. R. at 463–515, 517–21, 524–35.) In addition, Meadowbrook's Report included three different approaches for determining the fair market value[4] of the

---

4. Although Indiana did not assess property on the basis of fair market value in 1995, this Court has held:

The determination of obsolescence under Indiana's true tax value system obviously incorporates market value concepts. Therefore, a market value estimate is ap-

complex. These approaches, Meadowbrook contends, reveal that the property is entitled to economic obsolescence adjustment of between 31% and 52%.

## II. Meadowbrook's Quantification of Obsolescence

### A. Income Capitalization Approach

■ The income capitalization approach considers the present value of any future benefits of property ownership, and capitalizes the net income that the property produces. *See Meridian Towers*, 805 N.E.2d at 479 (citations omitted). It converts the net income and any other anticipated benefits of the income-producing property into property value. *See id.* Based upon its financial statements, Meadowbrook determined its net operating income, before real estate taxes, to be $180,672. (Cert. Admin. R. at 267.) It then applied a capitalization rate of 11.81% to the net income to arrive at an estimated fair market value of $1,529,822. (Cert. Admin. R. at 267.) After subtracting $186,400 for the value of the land as indicated on the 1995 property record card, Meadowbrook arrived at a fair market value of $1,343,422. (Cert. Admin. R. at 267, 271–87.)

### B. The Cost Approach

■ The cost approach estimates the current cost to construct a reproduction of the existing improvement, less de-

ductions for all accrued depreciation present in the property being appraised. *Meridian Towers*, 805 N.E.2d at 478. Based on the Marshall & Swift valuation guidelines, Meadowbrook determined the cost to reproduce its complex to be $2,823,383. (Cert. Admin. R. at 269.) Meadowbrook then subtracted the value of the complex under the income capitalization approach ($1,343,422) from the value of the complex under the cost approach, to reach a net cost of $1,479,961. (Cert. Admin. R. at 269.) It then divided the net cost by the reproduction cost to arrive at an obsolescence adjustment of 52%. (Cert. Admin. R. at 269.) This is a valid methodology for estimating obsolescence. *See Canal Square Ltd. P'ship v. State Bd. of Tax Comm'rs*, 694 N.E.2d 801, 807 (Ind.Tax.Ct.1998).

### C. Capitalization of Rent Loss Method

■ In order to quantify economic obsolescence via the capitalization of rent loss, Meadowbrook first estimated the rent loss for the entire property using market data.[5] (*See* Cert. Admin. R. at 264 (citing APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 393 (11th ed.)), 525–35.) Meadowbrook then compared its effective gross income pursuant to the HUD restrictions to unrestricted market rents, and arrived at a net annual rent loss of $103,401.[6]

propriate in the context of obsolescence. There is really no choice in this matter: the Court (and taxpayers) must accept quantifications ... that use market concepts.
*Lacy Diversified Indus., Ltd. v. Dep't of Local Gov't Fin.*, 799 N.E.2d 1215, 1224 n. 11 (Ind. Tax Ct.2003) (internal brackets and citation omitted).

5. In determining the estimated rent loss, Meadowbrook used a rent comparability study (Study) prepared by Matthew Rees, an Indiana Certified General Real Estate Appraiser. (*See* Cert. Admin. R. at 525–35.)

The Study, however, does not account for the market rent of three-bedroom townhouses. (*See* Cert. Admin. R. at 526.) To arrive at the market rent of this unit type, the Appraiser calculated the rent per square foot of a two-bedroom townhouse, and applied the per square foot rent to the square foot of the three-bedroom townhouse. (*See* Cert. Admin. R. at 264.)

6. To arrive at the market rent, Meadowbrook adjusted the 1999 rent comparability study it presented as evidence to reflect the rent as of

(Cert. Admin. R. at 264.) Meadowbrook then applied an 11.81% capitalization rate to the net annual rent loss to arrive at a value loss of $875,538. (Cert. Admin. R. at 265.) This value was then divided by the reproduction cost of the complex (after physical depreciation) as developed under the cost approach to indicate a capitalized rent loss of 31%. (Cert. Admin. R. at 265.)

Notwithstanding this evidence, the Indiana Board denied Meadowbrook's request for obsolescence on the basis that the complex had a tenant waiting list. (Cert. Admin. R. at 22, 45.) Furthermore, the Indiana Board asserted that Meadowbrook's calculations were flawed because they did not take into account the value of the mortgage subsidy interest nor the 6% return on investment. (Cert. Admin. R. at 45–46.) In addition, the Indiana Board objected to Meadowbrook's quantification methods because they labeled the condition of the complex as "average," yet when Meadowbrook previously sought a grade reduction for its property,[7] it claimed that the condition of the property was "below average." (Resp't Br. at 8–9) (*See also* Cert. Admin. R. at 14.) The Court, however, finds that the Indiana Board's holding is not supported by substantial evidence.

First, the Court presumes that because the property had a waiting list, both the Assessor and the Indiana Board determined that Meadowbrook had a high occupancy rate. The contention that Meadowbrook had no obsolescence because it had a high occupancy rate, however, is without merit. *See Loveless Constr. Co. v. State Bd. of Tax Comm'rs*, 695 N.E.2d 1045,

1050 (Ind. Tax Ct.1998) (stating that "[a] high occupancy rate is not necessarily determinative of whether obsolescence exists because a taxpayer may have had to reduce the rent to maintain the high occupancy rate" (citation omitted)), *review denied*. Moreover, in attempting to rebut Meadowbrook's causes of obsolescence, the Assessor merely testified, "I am not one on obsolescence. I think it is being totally utilized. [The complex] is in a good location. It has a bus that picks kids up[.]" (Cert. Admin. R. at 622.) These statements are insufficient to show that the property does not suffer from obsolescence. Consequently, the Court finds that Meadowbrook has presented probative evidence that has identified causes of economic obsolescence present in its complex.

Second, this Court has previously held that deed restrictions which lower the rent of subsidized housing units may be considered a cause of obsolescence because they "affect the income-producing ability of the apartment complex and thus its value." *Pedcor Investments–1990–XIII, L.P. v. State Bd. of Tax Comm'rs*, 715 N.E.2d 432, 437 (Ind. Tax Ct.1999). The Court, however, limited this holding by maintaining that "[financial benefits] must be taken into consideration when evaluating whether [ ] deed restrictions do, in fact, cause [an] apartment complex to experience economic obsolescence." *Id.* (footnote omitted).

In this case, the record indicates that the financial benefits Meadowbrook receives as a participant in the 236 Program do not counteract the diminished rental income associated with the HUD restric-

March 1, 1995. (*See* Cert. Admin. R. at 264.)

**7.** At the administrative hearing, Meadowbrook challenged its grade factor of "C," alleging it should have been at "C–1." The

Indiana Board granted that reduction, thereby agreeing that the quality of workmanship, construction, and materials used in constructing Meadowbrook's complex was "below average." (*See* Cert. Admin. R. at 29.)

tions. (*See* Cert. Admin. R. at 264.) Indeed, in its Report, Meadowbrook stated:

> T[he] interest rate subsidy [was] added to the rental income in each approach to reflect the impact of that financial benefit. Thus, by adding those subsidy dollars into the income recognizes this benefit[.] ... *The benefit of the interest subsidy as demonstrated does NOT make up for the loss in rental income incurred as a result of the HUD Program Restrictions.*

(Cert. Admin. R. at 266 (emphasis in original).) "When there is unrebutted evidence in the record demonstrating that federal tax incentive do not make up for the decreased rental income associated with the deed restrictions," the Indiana Board's final determination must be overturned. *See Pedcor,* 715 N.E.2d at 439 (footnote and citation omitted).

Third, the Indiana Board's contention that Meadowbrook's obsolescence calculations were flawed because it used both "average" and "below average" condition factors in those calculations, cannot stand. As Meadowbrook correctly asserts, it could not have relied on its "below-average" grade classification when quantifying obsolescence because obsolescence uses market-derived concepts. (*See* Pet'r Br. at 15, 20.) *See also Loveless Constr. Co.,* 695 N.E.2d at 1050 (holding "a comparison of an improvement's True Tax Value to its [market] value [via quantification of obsolescence] is essentially meaningless"). Consequently, it was appropriate for Meadowbrook to base its quantification on the Marshall & Swift "average" classification.

Meadowbrook has adequately accounted for its loss in property value with generally recognized appraisal techniques. *See Miller Structures,* 748 N.E.2d at 953–54; *Canal Square,* 694 N.E.2d at 807. Consequently, Meadowbrook triggered the Assessor's duty to rebut its evidence with an authoritative explanation. *See Miller Structures,* 748 N.E.2d at 948 (citation omitted). Because the Assessor has failed to rebut Meadowbrook's evidence, the Court finds that the Indiana Board's final determination is unsupported by substantial evidence, and is arbitrary, capricious, and an abuse of discretion. *See Meridian Towers,* 805 N.E.2d at 479 (stating that local assessing officials must rebut the validity of a taxpayer's calculations of obsolescence or offer alternative calculations of their own).

## CONCLUSION

For the aforementioned reasons, the Court REVERSES the Indiana Board's final determination, and REMANDS it to the Indiana Board in order to instruct the Assessor to award Meadowbrook's complex with a 31% obsolescence depreciation adjustment for the 1995 tax year.