GARVEY ELEVATORS, INC., APPELLANT, V.
ADAMS COUNTY BOARD OF EQUALIZATION, APPELLEE.

621 N.W.2d 518

Filed January 26, 2001.    No. S-00-226.

Carl J. Sjulin, of Rembolt Ludtke & Berger LLP, for appellant.

Donna Fegler Daiss, Adams County Attorney, for appellee.

HENDRY, C.J., WRIGHT, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

WRIGHT, J.

## NATURE OF CASE

Garvey Elevators, Inc. (Garvey), protested the 1998 assessment valuation of two parcels of commercial property it owned in Adams County, Nebraska. The Adams County Board of Equalization (Board) reduced the value of one of the parcels, but not the other. Garvey appealed the Board's determination to the Tax Equalization and Review Commission (TERC), which affirmed the decision of the Board. Garvey timely appealed to the Nebraska Court of Appeals, and we moved this case to our docket pursuant to our power to regulate the caseloads of this court and the Court of Appeals.

## SCOPE OF REVIEW

■ Any party aggrieved by a final decision in a case appealed to TERC shall be entitled to judicial review in the Court of Appeals. See Neb. Rev. Stat. § 77-5019(1) (Supp. 1999). In such an appeal, the appellate court reviews for errors appearing on the record of TERC. See § 77-5019(5). When reviewing an order for errors appearing on the record, the inquiry is whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Mid City Bank v. Douglas Cty. Bd. of Equal.*, 260 Neb. 282, 616 N.W.2d 341 (2000).

## FACTS

Garvey is in the grain storage and merchandising business. At one time, it owned approximately 30 elevator sites throughout Kansas, Texas, and Nebraska. Since 1994, Garvey has been in the process of winding down its business and has sold all but three of its sites, one of which is the subject of this appeal.

The property in question consists of two parcels of property located in Adams County, Nebraska. The first parcel, which we refer to as the "improved parcel," consists of approximately 22.09 acres. The improvements on this parcel have a total capacity of 8 million bushels, including a grain elevator terminal which has a concrete elevator with a total of 258 bins and 4,733,000 bushels of storage capacity. The elevator has a "headhouse" with access to various bins from both the top and bottom. There are two legs in the house that can handle 25,000 bushels per hour and two legs outside that can handle 7,000 bushels.

The improved parcel also has a "rail loadout facility" at the east end. In addition, there is a steel tank with a capacity of approximately 818,000 bushels. There is a flat storage building that is made of concrete and has a storage capacity of 2.5 million bushels. Other improvements include a grain dryer with two legs, two rail pits, two truck scales, an office/shop/break room, a storage building, and a "[c]over truck pit cover with two pits." The improved parcel has rail service from both Burlington Northern and Union Pacific railroads and has 4,600 feet of onsite rail trackage which may be used to load grain. The second parcel of property, which we refer to as the "unimproved parcel," consists of approximately 83.82 acres of solely agricultural land.

Garvey alleged in its protest to the Board that for the tax year 1998, the Adams County assessor proposed valuing the improved parcel in the amount of $1,965,375. This amount included $1,845,395 for the improvements on the property and $119,980 for the land itself. However, the property record card for the improved parcel indicates that the assessor had proposed valuing the improved parcel in the amount of $1,871,785, which included $1,757,520 for the improvements on the property and $114,265 for the land itself. As TERC noted, nothing in the record explains the difference between the valuations.

Garvey filed its protest regarding the improved parcel with the Board on June 16, 1998. Garvey requested that the valuation of the improved parcel be reduced to zero. On July 29, the Board reduced the 1998 assessment value of the improved parcel to $1 million. This amount included $880,020 for the improvements on the property and $119,980 for the land itself.

With respect to the unimproved parcel, Garvey claimed that the assessor had proposed valuing this property in the amount of $72,415 for the tax year 1998. Garvey also protested the valuation of the unimproved parcel and requested that the valuation be reduced to zero. TERC concluded that the Board's final determination of value for the unimproved parcel was $72,415.

On July 31, 1998, Garvey appealed the Board's decision to TERC. However, neither party filed a transcript of the proceedings before the Board as a part of the record.

At the hearing, TERC took notice of certain documents, as authorized by Neb. Rev. Stat. § 77-5016(5) (Supp. 1999), including

> the 1998 County Profiles for Adams County . . . the 1998 Assessor's Interviews by the Property Tax Division; the 1998 Qualified Sales Report Profiles; the 1999 Formal Plan of Equalization; the 1998 Statewide Equalization Proceedings; the Nebraska Real Estate Appraiser Board Certification Requirements . . . the Marshall Valuation Service Historical Information . . . three standard reference works published by the International Association of Assessing Officers: Property Assessment Valuation, Second Edition (1996); Property Appraisal and Assessment Administration (1990) . . . Glossary for Property Appraisal and Assessment (199[7]); the Soil Survey for Adams County; the Uniform Standards of Professional Appraisal Practice (1999); and 42 U.S.C. § 9601 and related statutes.

In its order, TERC made certain findings of fact and conclusions which are set forth below: TERC found that Garvey was the owner of record of the two parcels of property in question and that the Board had granted Garvey's protest in part by reducing the assessed value of the improved parcel to $1 million. TERC found that Garvey had also protested the assessor's

proposed value of $72,415 for the unimproved parcel, but noted that there was no record of the Board's action on this portion of the protest.

The evidence showed that AGP Grain Cooperative (AGP) had offered to purchase 30 grain elevators from Garvey in the early 1990's subject to an environmental site assessment for each property. AGP acquired 27 of these elevators from Garvey but did not purchase the other 3 based on the results of the environmental site assessments. When a "Phase I Environmental Site Assessment" was conducted on the property in question, it was determined that the soil was contaminated with carbon tetrachloride in an area consisting of approximately 502,655 square feet extending down to the water table. The total soil affected was estimated to be 55 million cubic feet.

The results from the second stage of the assessment showed that tap water samples contained 199 micrograms per liter of carbon tetrachloride. The maximum level of carbon tetrachloride allowed in ground water in Nebraska is 5 micrograms per liter. The measured concentrations of carbon tetrachloride obtained from the site exceeded both state and federal standards. It was undisputed that none of the buildings on the property were contaminated or otherwise affected.

Garvey offered evidence that it had submitted proposed remediation plans to the Nebraska Department of Environmental Quality (DEQ) to address both the soil and ground water contamination. As of January 1, 1998, Garvey had not begun remediation efforts to correct the contamination caused by the carbon tetrachloride.

The evidence showed that instead of selling this property to AGP, Garvey had entered into a "Put Through Agreement" with AGP. The term of the agreement was 5 years commencing April 1, 1997, and ending March 31, 2002. The agreement granted AGP the exclusive right to "put through" its grain, seed, feed, and other similar commodities at Garvey's facility. AGP agreed to pay Garvey a fee equal to three-quarters of 1 cent per bushel of grain loaded out by Garvey. It guaranteed that no less than 1,444,444 bushels of grain would be loaded out each month. Pursuant to this agreement, the minimum fee that Garvey would receive was $10,833.33 per month. In addition, if the number of

bushels loaded out at the end of the year exceeded 17,333,333, AGP agreed to pay Garvey three-quarters of 1 cent per bushel in excess of that amount. AGP also agreed to pay Garvey reasonable operating costs incurred in connection with the property during the agreement. It further agreed to pay $61,211.27 at the execution of the agreement as reimbursement for improvements made to the property by Garvey. The agreement contained a purchase option which permitted AGP to purchase the property for $1.7 million.

TERC found that from the record before it, the actual or fair market value (including the effect on value of the contamination) as of the assessment date was $1 million for the improved parcel. TERC found that the property record card for the unimproved parcel demonstrated that the Board's final determination of value for the unimproved parcel was $72,415 and that $72,415 was the actual or fair market value as of the assessment date. TERC concluded that there was not sufficient evidence to establish that the decision of the Board was unreasonable or arbitrary. TERC therefore affirmed the decision of the Board. Accordingly, TERC determined that for the 1998 tax year, the value of the improved parcel was $1 million and the value of the unimproved parcel was $72,415. Garvey timely appealed.

## ASSIGNMENTS OF ERROR

Garvey asserts that TERC erred (1) in affirming the decision of the Board, (2) in finding that the Board's valuation was entitled to a presumption of validity, (3) in disregarding the substantial competent evidence adduced by Garvey which demonstrated that the valuation was arbitrary and unreasonable, and (4) in overruling Garvey's objections and considering arbitrary, capricious, and irrelevant evidence.

## ANALYSIS

Our review is for errors appearing on the record of TERC. Any party aggrieved by a final decision in a case appealed to TERC shall be entitled to judicial review in the Court of Appeals. See § 77-5019(1). In such an appeal, the appellate court reviews for errors appearing on the record of TERC. See § 77-5019(5). When reviewing an order for errors appearing on the record, the inquiry is whether the decision conforms to the

law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. *Mid City Bank v. Douglas Cty. Bd. of Equal.*, 260 Neb. 282, 616 N.W.2d 341 (2000).

Neb. Rev. Stat. § 77-1511 (Reissue 1996) provides that TERC shall affirm the action taken by a county board of equalization unless evidence is adduced establishing that the action taken by the board was unreasonable or arbitrary, or unless evidence is adduced establishing that the property of the appellant is assessed too low. We have held that § 77-1511 creates a presumption that a county board of equalization has faithfully performed its official duties in making an assessment and has acted upon sufficient competent evidence to justify its action. See *Bartlett v. Dawes Cty. Bd. of Equal.*, 259 Neb. 954, 613 N.W.2d 810 (2000). That presumption remains until there is competent evidence to the contrary presented, and the presumption disappears when there is competent evidence adduced on appeal to the contrary. *Id.* From that point forward, the reasonableness of the valuation fixed by the board of equalization becomes one of fact based upon all the evidence presented. *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 606 N.W.2d 786 (2000). The burden of showing such valuation to be unreasonable rests upon the taxpayer on appeal from the action of the board. *Id.* In an appeal from a county board of equalization, the burden of persuasion imposed on the complaining taxpayer is not met by showing a mere difference of opinion unless it is established by clear and convincing evidence that the valuation placed on the property when compared with valuations placed on other similar property is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment. *US Ecology v. Boyd Cty. Bd. of Equal.*, 256 Neb. 7, 588 N.W.2d 575 (1999).

Garvey first argues that the Board's valuation is not entitled to any presumption because the Board failed to act upon its own information and failed to utilize any of the required statutory methods for determining the actual value of the property. Garvey claims that because the Board did not offer any evidence to support its valuation of the subject property, the Board was not entitled to a presumption of validity regarding the $1 million valuation.

In support, Garvey relies upon *First Nat. Bank v. Otoe Cty.*, 233 Neb. 412, 445 N.W.2d 880 (1989). At that time, an appeal from the county board of equalization was tried de novo in the district court. On appeal to the Supreme Court, an equity case involving an action by a county board of equalization was a trial of factual questions de novo on the record, requiring the Supreme Court to reach a conclusion independent of the findings of the trial court.

The dissent in *First Nat. Bank*, citing *Grainger Brothers Co. v. Board of Equalization*, 180 Neb. 571, 144 N.W.2d 161 (1966), stated:

> The record shows that the county assessor had never been in the building, did not personally inspect or measure the property, and relied entirely upon the determination that had been made by the appraisal company. Where the assessor does not act upon his own information, or does not make a personal inspection of the property, there is no presumption that the official assessment is valid.

*First Nat. Bank*, 233 Neb. at 422, 445 N.W.2d at 887.

The denial of this presumption was based upon *H/K Company v. Board of Equalization*, 175 Neb. 268, 121 N.W.2d 382 (1963), in which we stated that generally the valuation of property made by an assessor for taxation purposes is presumed to be correct if it reflects the assessor's own information and judgment. If the assessor does not inspect the property and accepts the valuation fixed by another person, this presumption does not exist.

We are not persuaded by Garvey's argument that the Board was not entitled to such presumption. The cases relied upon by Garvey address the presumption given to the determination made by the assessor. At the hearing before TERC, the current assessor testified that she was not the assessor at the time the Board made its determination. The testimony did not establish that the assessor who valued the property had failed to perform any analysis to support the assessor's valuation of the property. No record was made of the proceedings before the Board, and there was no evidence to establish that a valid assessment of the property had not been made. Each party was in agreement that the value of the property before consideration of the contamination issue was $1.9 million.

Accordingly, we determine Garvey did not establish that the Board was not entitled to a presumption that the Board faithfully performed its official duties in making the assessment and acted upon sufficient competent evidence to justify its action. What is before us is the Board's reduction of the valuation made by the assessor. Accordingly, Garvey's attempt to show that the assessor did not perform his or her official duties in making the assessment of the property is not at issue.

■ In conjunction with this argument, Garvey claims that the Board failed to utilize any of the methods required by Neb. Rev. Stat. § 77-112 (Cum. Supp. 1998) to determine the actual value of the property.

> Actual value of real property for purposes of taxation shall mean the market value of real property in the ordinary course of trade. Actual value may be determined using professionally accepted mass appraisal methods, including, but not limited to, the (1) sales comparison approach, taking into account factors such as location, zoning, and current functional use, (2) income approach, and (3) cost approach.

§ 77-112. Garvey claims the Board was required to produce evidence to show how it determined the actual value of the property in accordance with § 77-112. Garvey claims that because the Board did not contradict its evidence in support of a zero valuation, such evidence was therefore undisputed and TERC's decision must be reversed. This argument also fails.

As set forth above, since the burden is upon Garvey to show that the Board's valuation was unreasonable, it must first rebut the presumption given to the Board that it has faithfully performed its duties and has acted upon sufficient competent evidence. Unless Garvey presents competent evidence to rebut such presumption, TERC must affirm the action of the Board. It is only if Garvey successfully presents competent evidence to rebut this presumption that the reasonableness of the valuation fixed by the Board becomes one of fact based upon all the evidence presented. If Garvey successfully rebuts the presumption, then the Board would be required to present evidence in support of its determination of value of the property. Here, it was uncontested that the value of the property if not contaminated was

approximately $1.9 million. The Board then reduced the value of the improved parcel to $1 million. Garvey must show by competent evidence that this action by the Board was unreasonable or arbitrary.

In *Bottorf v. Clay Cty. Bd. of Equal.*, 7 Neb. App. 162, 168, 580 N.W.2d 561, 566 (1998), the Court of Appeals stated: "Based upon the applicable law, the Board need not put on any evidence to support its valuation of the property at issue unless the taxpayer establishes the Board's valuation was unreasonable or arbitrary." In discussing how this presumption is to be overcome, we stated in *Constructors, Inc. v. Cass Cty. Bd. of Equal.*, 258 Neb. 866, 871, 606 N.W.2d 786, 791 (2000), that "[t]he threshold hurdle that the appellants must overcome is the presumption that the Board faithfully performed its official duties in making an assessment and acted upon sufficient competent evidence to justify its action." In order to successfully rebut this presumption, Garvey must present competent evidence to the contrary. Until there has been competent evidence presented, the Board does not have to present any evidence to support its valuation.

TERC determined that Garvey had presented no evidence of comparable properties in Adams County. TERC found that Garvey's evidence of actual value, a "Summary Appraisal Report" (exhibit 2) and a "Restricted Appraisal Report" (exhibit 17), were not credible. Since TERC concluded that Garvey's evidence was not credible, it found that Garvey had not successfully rebutted the existing presumption. Thus, TERC concluded that there was insufficient evidence to establish that the Board's decision was unreasonable or arbitrary.

Garvey argues that even if the Board is entitled to the aforementioned presumption, it successfully rebutted such presumption and that, therefore, the Board was required to put on evidence to support its valuation. See *Bottorf v. Clay Cty. Bd. of Equal., supra.* In support, Garvey argues that because the actual value of the improved parcel if uncontaminated was approximately $1.9 million and because a buyer would incur $4,884,000 in remediation expenses, the property had no market value. Garvey contends that no rational buyer would be willing to assume such liability, and therefore, the property has no value.

We therefore proceed to determine whether TERC was clearly wrong in its conclusion that the evidence presented by Garvey was not credible. See *Bartlett v. Dawes Cty. Bd. of Equal.*, 259 Neb. 954, 613 N.W.2d 810 (2000). The unreasonableness of the valuation must be established by clear and convincing evidence that such valuation when compared with valuations placed on other similar property is grossly excessive and is the result of a systematic exercise of intentional will or failure of plain duty and not mere errors of judgment. See *US Ecology v. Boyd Cty. Bd. of Equal.*, 256 Neb. 7, 588 N.W.2d 575 (1999). Unless such unreasonableness is shown, TERC must affirm the action taken by the Board. See § 77-1511.

In analyzing Garvey's evidence, TERC found that there were two professionally accepted valuation methodologies for the valuation of contaminated property. Under the first and preferred method, the unimpaired value of the property is determined and then the costs of remediation must be accounted for. TERC noted that in the first methodology,

"[t]he starting point for determining market value for properties affected by contamination is the unencumbered, or unimpaired value. This is the value that property would have if no adjustment were made for any environmental problems. Unencumbered value is obtained using standard appraisal methods. Having arrived at an unencumbered value, the appraiser considers costs to correct or control environmental problems as a deduction."

TERC found that the appraiser's reports, which fully deducted the costs to correct or control environmental problems from the unimpaired value, would overstate value lost. Each of the reports showed that if the cleanup costs were deducted directly from the value of the property, a negative property value would be obtained. TERC concluded that such a result was not credible because the property has value in use.

A similar situation was discussed by the New Jersey Supreme Court in *Inmar Associates, Inc. v. Borough of Carlstadt*, 112 N.J. 593, 549 A.2d 38 (1988). There, the court concluded that the methodology for resolving the question of valuation was not simply to deduct the cost of the cleanup from a putative value of

the property. The court stated that such methodology would reflect only the cost accounting practices of the current owners.

Garvey's summary appraisal report concluded that the actual or fair market value of the property as of the assessment date was zero. TERC found that this conclusion was based on the assumptions that there was a dollar-for-dollar reduction in the value of the property by the amount of all the costs of remediation and that all of the capital costs should be deducted in the first year. TERC found that Garvey's appraiser had not justified the use of a dollar-for-dollar reduction in value for the costs of soil remediation and that nothing in the record established that a dollar-for-dollar reduction for these costs should be made against the unimpaired value. The remaining costs were for ground water remediation and ground water monitoring which had not been approved by DEQ. However, Garvey's evidence showed that it did not have an immediate goal of implementing a ground water remediation plan which would achieve 5 parts per billion of carbon tetrachloride.

TERC concluded that if Garvey did not intend to implement such a plan, then the costs for ground water remediation should not be deducted from the value of the property. There was also an issue as to whether Garvey was in fact required by DEQ to remediate the contamination. TERC found that given the clear and convincing standard imposed on Garvey to show that the Board's action was unreasonable, it could not conclude that the dollar-for-dollar reduction incorporated in Garvey's appraiser's opinion of value was appropriate.

TERC also found that Garvey's assumption that all capital costs should be charged off in the first year was not supported by the evidence. Garvey's treasurer testified that as of January 1, 1998, the assessment date, no remediation efforts had been undertaken. Under those circumstances, TERC found that it could be inferred that no capital improvements had been made in 1997 and that, therefore, the costs were speculative as of the assessment date. In addition, Garvey's appraiser did not explain why the entire amount of capital improvements should be charged off in 1 year.

In considering the weight and credibility of the appraisal reports, TERC found that the appraiser's conclusions regarding

value differed widely between the two reports. These appraisals identified two different sets of remediation costs. The first set of remediation costs included the costs of onsite remediation. The summary appraisal report purported to derive these costs from Garvey's remediation plan. However, there were several significant differences in the numbers. The restricted appraisal report's remediation plan set out the costs for a 5-year remediation program, while the summary appraisal report used a period of 10 years to complete the remediation. The soil remediation plan in the restricted appraisal report cost $193,000 for operation and maintenance per year, while the summary appraisal report used an annual maintenance cost of $105,000 per year. Despite differences in the cost figures used in each of these documents, the total cost for the onsite remediation was approximately the same—$2.3 million.

The summary appraisal report also considered costs for offsite down-gradient treatment, which Garvey's remediation plan did not include. These costs were not found in any of the engineering reports, and Garvey's appraiser testified that he did not know where these numbers came from and that they were not in the reports. TERC concluded that since Garvey's treasurer had testified that no remediation efforts had been undertaken as of the assessment date, all the costs were speculative.

The reports also gave different estimates of cash flow for the property. The restricted appraisal report estimated that the net cash flow would be $290,860 for each year after the first year. The summary appraisal report estimated a negative cash flow of $121,140 for years two through six and a positive $378,860 thereafter.

Both appraisals stated an uncontaminated value of $1.9 million, but the restricted appraisal report gave an actual fair market value of $410,000. The summary appraisal report valued the property at zero. Because both appraisals had deducted all the capital costs in the first year on a dollar-for-dollar basis from the actual market value of the property, TERC concluded that Garvey's appraiser's final opinion of value did not comply with the International Association of Assessing Officers' standards on valuation of property affected by environmental contamination.

The second valuation methodology requires a determination of the "value in use." The phrase "value in use" is defined as the value of property for a specific use. See International Association of Assessing Officers, Glossary for Property Appraisal and Assessment 153 (1997). In discussing the value in use of the property, TERC found that Garvey's appraiser's opinion that the subject property had zero value was contradicted by professionally accepted mass appraisal methods. Specifically, TERC noted:

> "Two concepts of value that must be considered in reference to environmentally distressed property are the unencumbered value and the value in use of the property.

> "The unencumbered value is the value that the property would have if no adjustment were made for any environmental encumbrance. This value can be obtained using standard appraisal methods. There is a tendency to discount this value based on costs related to remediating or isolating the environmental contamination. Fully deducting the costs may overstate the decline in value, because the value in use concept would then be ignored. Value in use suggests that a property which is still in use, or which can be used in the near future, has a value to the owner. This would be true even if costs to cure environmental problems exceed the nominal, unencumbered value. The value in use will most nearly reflect the market value of the property."

As previously stated, TERC found that the evidence established that the subject property had value in use. Garvey's appraiser testified that the highest and best use of the property was as a grain elevator. The improved parcel was currently being put to its highest and best use as of the assessment date and was generating income. The Put Through Agreement between Garvey and AGP generated $10,833.33 per month. AGP was also required to pay Garvey $61,211.27 at the execution of the agreement as reimbursement for improvements made upon the property and to reimburse Garvey for reasonable operating costs. The agreement had an initial term of 5 years and contained a 5-year option. There was also an option to purchase the property at any time during the life of the agreement for an additional payment of $1.7 million.

TERC found that Garvey's appraiser lacked training, education, and experience in the valuation of contaminated properties and that the appraiser's opinions regarding the impact of contamination on the actual or fair market value of the subject property as of the assessment date were not credible. It concluded that Garvey's appraiser was not an expert in the valuation of contaminated property and that the appraisal reports were not credible evidence that the property had no value. TERC concluded that since this evidence was Garvey's only evidence of the impact of the contamination on the value of the subject property, Garvey had not sustained its burden of proof.

As to the unimproved parcel, TERC found that the record did not establish what action, if any, the Board took regarding the assessed value. The property record card showed that the 1998 valuation was $72,415. TERC therefore inferred from the limited record before it that the Board, after protest, determined that the actual or fair market value of the unimproved parcel was $72,415.

From the entire record before it, TERC concluded that Garvey had failed to demonstrate that the actions of the Board were unreasonable and arbitrary. We agree.

Our review of TERC's decision is to determine whether the decision conforms to the law, is supported by competent evidence, and is neither arbitrary, capricious, nor unreasonable. See *Mid City Bank v. Douglas Cty. Bd. of Equal.*, 260 Neb. 282, 616 N.W.2d 341 (2000). We conclude that TERC's determinations that Garvey failed to provide credible evidence that the Board's actions were unreasonable or arbitrary and that Garvey did not rebut the presumption that the Board faithfully performed its duties and acted upon sufficient competent evidence were not clearly wrong. Garvey failed to establish by clear and convincing evidence that the valuations placed upon its property when compared to valuations placed on other similar property were grossly excessive and the result of a systematic exercise of intentional will or failure of plain duty, and not mere errors of judgment. See *US Ecology v. Boyd Cty. Bd. of Equal.*, 256 Neb. 7, 588 N.W.2d 575 (1999).

Garvey's final argument asserts that TERC erred in overruling its objections and in considering arbitrary, capricious, and irrele-

vant evidence. The evidence to which Garvey objected related to the status of other properties that Garvey currently owned or owned at one time. We conclude that the information derived from this line of questioning did not factor into TERC's analysis of the valuation of the subject property. TERC's decision was based on the conclusion that the summary appraisal report and the restricted appraisal report were not credible. Therefore, we conclude that this assignment of error is without merit.

### CONCLUSION

Based upon our review for errors appearing on the record, we conclude that TERC did not act arbitrarily, capriciously, or unreasonably in affirming the decision of the Board. TERC's determination is supported by competent evidence and conforms to the law. We therefore affirm.

AFFIRMED.

CONNOLLY, J., not participating.