LAKE COUNTY ASSESSOR, Calumet Township Assessor, and Lake County Property Tax Assessment Board of Appeals, Petitioners,

v.

UNITED STATES STEEL CORPORATION, Respondent.

No. 49T10–0703–TA–19.

Tax Court of Indiana.

Feb. 9, 2009.

John S. Dull, Attorney at Law, Brian P. Popp, Laszlo & Popp PC, Dock McDowell Jr., The McDowell Law Firm, Merrillville, IN, Charles C. Meeker, Charles E. Raynal, Parker Poe Adams & Bernstein LLP, Raleigh, NC, Attorneys for Petitioners.

Thomas M. Atherton, David A. Suess, Bose McKinney & Evans LLP, Indianapolis, IN, Attorneys for Respondent.

FISHER, J.

The Lake County Assessor, the Calumet Township Assessor, and the Lake County Property Tax Assessment Board of Appeals (PTABOA) (collectively, Lake County) appeal the final determination of the Indiana Board of Tax Review (Indiana Board) valuing United States Steel Corporation's (U.S. Steel) real property as of the March 1, 2001 assessment date. Because the pleadings, orders, and other materials in this case have been filed under seal, *see generally* Indiana Administrative Rule 9, this Court's opinion will provide only that information necessary for the reader to understand its disposition of the issues.

## RELEVANT FACTS AND PROCEDURAL HISTORY

US Steel owns and operates an integrated steel manufacturing plant, known as the Gary Works, in Calumet Township, Lake County, Indiana. The plant, which was initially constructed in 1906, has been greatly modified over the years to accommodate new technologies in the steelmaking industry. As of March 1, 2001, U.S. Steel's plant consisted of 3,155 acres of land and over 700 buildings with more than 15 million square feet of space. A portion of the Grand Calumet River runs through U.S. Steel's property.

For the year at issue, the Calumet Township Assessor (the Assessor) assigned U.S. Steel's plant an assessed value of $269,801,300: $59,582,900 for the land and $210,218,400 for the improvements. In arriving at the assessed value of the improvements, the Assessor applied a functional obsolescence adjustment of $23,112,230.

Believing the assessment to be too high, U.S. Steel filed an appeal with the PTA-BOA. The PTABOA denied U.S. Steel's request for relief. US Steel then filed an appeal with the Indiana Board, claiming that its improvements were entitled to a larger obsolescence adjustment and that its land was entitled to a reduction in value to account for the presence of environmental contamination therein.

In June of 2006, the Indiana Board conducted a four-day hearing on U.S. Steel's appeal. During the hearing, U.S. Steel presented two alternate calculations quantifying the amount of obsolescence it believed was present in its property. The first calculation was comprised of three separate parts: part one utilized a "change-in-pricing" methodology to calculate the amount of functional obsolescence present in the improvements due to super-adequate construction, excessive clearance, and excessive building size; part two utilized an "excess operating cost" methodology to calculate the amount of functional obsolescence present in the improvements due to inefficient building layout; and part three utilized a "business enterprise value" methodology to calculate the amount of economic obsolescence present in the improvements due to excess global capacity, market competition, and reduced product demand (hereinafter, "Calculations # 1–A, # 1–B, and # 1–C"). US Steel's alternate obsolescence calculation quantified the total amount of obsolescence present in its property (i.e., functional and economic forms *combined*) by comparing the property's market value as determined by the Marshall & Swift cost approach with its market value as determined by a sales comparison approach (the difference between the two values representing total obsolescence) (hereinafter, "Calculation # 2").[1] With respect to its land, U.S. Steel presented evidence demonstrating that the portion of the Grand Calumet River running through its property was environmentally contaminated as of the assessment date and what it subsequently spent to remediate that contamination.

On February 23, 2007, the Indiana Board issued its final determination in the matter. The Indiana Board found that U.S. Steel had prima facie demonstrated that its improvements were entitled to both functional and economic obsolescence adjustments, as it had both identified the causes of obsolescence from which its property suffered and then quantified the amount of obsolescence present using generally accepted appraisal techniques.[2] The Indiana Board also found that U.S. Steel had prima facie demonstrated that its land was entitled to a reduction in value—equivalent to the amount it spent in its remediation efforts—to account for the environmental contamination present therein. As a result of its findings, U.S. Steel's total assessment was reduced to $90,000,000.

On March 29, 2007, Lake County initiated this original tax appeal. The Court heard the parties' oral arguments on December 21, 2007. Additional facts will be supplied as necessary.

## ISSUES

On appeal, Lake County presents several issues for the Court to decide. The Court restates those issues as:

I. Whether the Indiana Board erred when it admitted U.S. Steel's Excess Cost Report under Calcula-

---

1. In the end, Calculation # 2 called for an obsolescence adjustment 14% higher than that called for by Calculations # 1–A, # 1–B, and # 1–C combined.

2. Because U.S. Steel's two obsolescence calculations presented two different results, the Indiana Board reconciled them and applied one overall adjustment.

tion # 1–B because it was not "scientifically reliable";

II. Whether the Indiana Board erred when it failed to discount U.S. Steel's total functional obsolescence award by $23,112, 230;

III. Whether the Indiana Board erred when it failed to find that Calculation # 2 was invalid because it utilized bankruptcy sales in its sales comparison approach;

IV. Whether the Indiana Board erred when it held that U.S. Steel was entitled to an obsolescence adjustment at all, given the result of Calculation # 1–C; and

V. Whether the Indiana Board erred in reducing the assessed value of U.S. Steel's land.

## ANALYSIS AND OPINION

### Standard of Review

■ When this Court reviews an Indiana Board final determination, it is limited to determining whether it is:

(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(2) contrary to constitutional right, power, privilege, or immunity;

(3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory jurisdiction, authority, or limitations;

(4) without observance of procedure required by law; or

(5) unsupported by substantial or reliable evidence.

IND.CODE ANN. § 33–26–6–6(e)(1)–(5) (West 2009). The party seeking to overturn the Indiana Board's final determination bears the burden of demonstrating its invalidity. *Osolo Twp. Assessor v. Elkhart Maple Lane Assocs.*, 789 N.E.2d 109, 111 (Ind. Tax Ct.2003).

### Discussion

I. *The Admissibility of U.S. Steel's Excess Cost Report*

In its final determination, the Indiana Board held that, under Calculation # 1–B, U.S. Steel presented an unrebutted prima facie case that its plant was entitled to a functional obsolescence adjustment due to an inefficient building layout. Indeed, the Indiana Board explained that U.S. Steel presented probative evidence explaining why and how its improvements were inefficiently laid out and then, through its "Excess Cost Report" (Report), used generally recognized appraisal techniques to quantify the negative impact the layout had on the value of its property.[3] (*See* Cert. Admin. R., Vol. 1 ¶¶ 74–76, 78 at 482–83, ¶¶ 115–36, 143–51 at 489–96 (footnote added).) (*See also* Cert. Admin. R., Vol. 5 at 1403–06, 1732–50, 2263–305.)

■ On appeal, Lake County argues that the Indiana Board erred in finding that U.S. Steel prima facie quantified the impact its building design had on the value of its property. Specifically, Lake County contends that the foundation of U.S.

---

**3.** More specifically, U.S. Steel reconfigured its buildings into a layout that would be employed in a modern replacement plant and then, in its Report, compared its operating costs incurred at its existing plant with what it estimated its operating costs would be at the modern replacement plant. This Court has previously explained that "estimating the increase in operating expenses for [a] subject property over [those operating expenses at a] modern replacement" is an acceptable method by which to measure how much of an actual loss has been incurred due to an inefficient building design. *See Inland Steel Co. v. State Bd. of Tax Comm'rs*, 739 N.E.2d 201, 217 (Ind. Tax Ct.2000) (citation omitted), *review denied.*

Steel's quantification—its Report—was "scientifically unreliable" pursuant to Indiana Evidence Rule 702(b) and the holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).[4] (*See* Pet'r Br. at 33–41 (footnote added).) As a result, Lake County asserts that the Indiana Board should have excluded the Report as evidence and found instead that U.S. Steel failed to meet its burden.[5] (*See* Pet'r Br. at 33–41 (footnote added).) The Court must disagree, given that Lake County's claim simply ignores the law.

Time and time again, over the course of the last ten years, this Court has explained that generally recognized appraisal techniques are acceptable methods by which to quantify obsolescence in Indiana's pre-2002 assessment system. *See, e.g., Meadowbrook N. Apartments v. Conner*, 854 N.E.2d 950, 957 (Ind. Tax Ct.2005); *Heart City Chrysler/Lockmandy Motors v. Dep't of Local Gov't Fin.*, 801 N.E.2d 215, 217 (Ind. Tax Ct.2004); *Inland Steel Co. v. State Bd. of Tax Comm'rs*, 739 N.E.2d 201, 211 (Ind. Tax Ct.2000), *review denied; Clark v. State Bd. of Tax Comm'rs*, 694 N.E.2d 1230, 1242 n. 18 (Ind. Tax Ct.1998). Furthermore, the Court has held that the method utilized by U.S. Steel in its Report is a generally recognized appraisal technique for calculating functional obsolescence. *See Inland Steel*, 739 N.E.2d at 214–18. The Indiana Board's final determination with respect to this issue is therefore AFFIRMED.[6]

II. *Discounting U.S. Steel's Total Functional Obsolescence Award*

Prior to the administrative hearing in this matter, U.S. Steel and Lake County provided the Indiana Board with a stipulation as to

---

**4.** Indiana Rule of Evidence 702(b) states "[e]xpert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable." Ind. Evidence Rule 702(b). In turn, the U.S. Supreme Court has explained that when determining whether scientific principles are reliable under Federal Rule of Evidence 702, a court may consider such factors as whether the scientific theory or technique can be or has been tested, whether it has been subjected to peer review and publication, whether it possesses a known or potential error rate, and whether it has been generally accepted within the relevant field of study. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Here, Lake County maintains that U.S. Steel's Report was "scientifically unreliable" because it: 1) was developed by U.S. Steel employees rather than outside consultants; 2) who made certain, untested assumptions regarding the calculation of operating costs at U.S. Steel; and 3) then compared those operating costs against those at a completely non-existent, hypothetical steel facility instead of an existing industry standard. (*See* Pet'r Br. at 14–15, 33–41.)

**5.** When it filed its appeal, Lake County also claimed that the Indiana Board should have excluded the Report, pursuant to the doctrines of res judicata and collateral estoppel, because U.S. Steel sought an obsolescence adjustment in 2001 on its personal property assessment using the same costs. (*See* Pet'r Br. at 20–33.) The Court disposed of that claim, however, in a previous order.

**6.** This Court's opinion in *Inland Steel* mentions that the State Board of Tax Commissioners (the Indiana Board's predecessor), in its final determination, found the same analysis to be both "generally scientifically reliable" and "credible." *See Inland Steel*, 739 N.E.2d at 214, 218. Lake County attempts to make much of this fact, arguing that "[i]n the *Inland Steel* case, the [Tax] Court [ ] affirmed the admission of evidence of alleged excess operating costs shown by a hypothetical replacement plant only where the taxpayer had first established, and the State Board had first concluded, that the evidence was 'generally scientifically reliable.' " (Pet'r Br. at 33–34.) Lake County simply tries to read more into the *Inland Steel* opinion than what is there.

the value of all improvements at Gary Works after application of scheduled depreciation pursuant to the [Indiana] Assessment Manual, subject to the following[:] ... [1)] that U.S. Steel may introduce evidence at the hearing, if otherwise admissible, of additional obsolescence it contends existed at the Gary Works property as of March 1, 2001[; and 2)] ... that Lake County ... may introduce evidence at the hearing, if otherwise admissible, of additional obsolescence [it] contend[s] is already factored into the [ ] value[.]

(Cert. Admin. R., Vol. 8 at 3263–64.) During the hearing, however, the parties disagreed as to what the stipulated value actually represented: US Steel maintained that it represented the improvements' value prior to any reduction for obsolescence, while Lake County maintained that it already included the Assessor's initial functional obsolescence adjustment of $23,112,230. In its final determination, the Indiana Board resolved the issue in U.S. Steel's favor. On appeal, Lake County contends this was in error. The Court agrees.

The Indiana Board's entire analysis with respect to this issue is as follows. First, it provided the definitions for the terms "reproduction cost" and "remainder value."[7] (*See* Cert. Admin. R., Vol. 1 ¶¶ 54–57 at 479–80 (footnote added).) After acknowledging that the parties disagreed as to

what the stipulated value represented, the Indiana Board stated:

> [After reviewing] the definition of remainder value as well as the evidence and arguments of the parties[, the Board] finds that the [stipulated value] is remainder value. When a property suffered no obsolescence, its remainder value and true tax value would be the same. True tax value is less than remainder value when obsolescence is present. Thus, U.S. Steel is entitled to a further reduction to the extent it proves additional functional and/or economic obsolescence.

(Cert. Admin. R., Vol. 1 ¶¶ 61–63 at 480.) The mere definition of "remainder value," however, does not constitute a finding adequate to support a conclusion as to what the parties intended the stipulated value to mean. *See, e.g., Cedar Lake Conference Ass'n v. Lake County Prop. Tax Assessment Bd. of Appeals,* 887 N.E.2d 205, 207 (Ind. Tax Ct.2008) (explaining that the Indiana Board's findings must be supported by substantial evidence and its final conclusion must be supported by the findings), *review denied; Amax Inc. v. State Bd. of Tax Comm'rs,* 552 N.E.2d 850, 852 (Ind. Tax Ct.1990) (defining substantial evidence as that which a reasonable mind might accept as adequate to support a conclusion).

 A stipulation is "[a] voluntary agreement between opposing parties concerning some relevant point[.]" BLACK's

---

7. Real property in Indiana is assessed on the basis of its "true tax value." *See* IND. CODE ANN. §§ 6–1.1–31–5, –6(c) (West 2009). During the year at issue, an industrial improvement's true tax value was equal to its reproduction cost (as calculated under the State Board's assessment regulations) less any physical and/or obsolescence depreciation present therein. *See* 50 IND. ADMIN. CODE 2.2–10–5(d)(15) (2001) (repealed 2002); 50 IND. ADMIN. CODE 2.2–10–7(f) (2001) (repealed 2002). *See also* 50 I.A.C. 2.2–10–7(a)–(d)

(stating that an improvement's physical depreciation is calculated as a function of its age and condition). Specifically, however, "[o]bsolescence depreciation is applied after the application of physical depreciation. This process is called remainderment. [An improvement's r]eproduction cost minus physical depreciation equals [its] remainder value. [An improvement's r]emainder value minus obsolescence depreciation equals [its] true tax value." 50 I.A.C. 2.2–10–7(f).

LAW DICTIONARY 1455 (8th ed.2004). Because a stipulation is akin to a contract, *see id.*, the intent of the parties in drafting the stipulation controls. *See Ashbaugh v. Horvath,* 859 N.E.2d 1260, 1266 (Ind.Ct. App.2007) (citation omitted). In turn, the parties' intent is to be determined from the "four corners" of the stipulation itself. *See id.* Here, the parties' stipulation indicates that the parties may either prove or disprove the existence of "additional" obsolescence. Thus, the reasonable inference is that the Assessor's initial obsolescence award was already included in the stipulated value. *See* WEBSTER'S THIRD NEW INT'L DICTIONARY at 24 (2002) (defining "additional" as "existing or coming by way of addition: added, further"). The Indiana Board's final determination with respect to this issue is therefore REVERSED. The matter is REMANDED to the Indiana Board with instructions to discount U.S. Steel's total functional obsolescence award by $23,112,230.

### III. *The Use of Bankruptcy Sales in the Sales Comparison Approach to Value*

As mentioned earlier, U.S. Steel presented a second, alternate calculation of obsolescence at the Indiana Board hearing. This second calculation quantified functional and economic obsolescence collectively by comparing the property's market value as determined by the Marshall & Swift cost approach with its market value as determined by a sales comparison approach (the difference between the two values representing total obsolescence). On appeal, Lake County does not claim that this method is inappropriate for quantifying obsolescence.[8] Rather, it claims

U.S. Steel's use of bankruptcy sales in determining the market value of its own property under the sales comparison approach rendered the calculation invalid.

■■■ The sales comparison approach is a method of estimating a property's market value by comparing it to similar, or comparable, properties that have sold in the market. *See, e.g., State Bd. of Tax Comm'rs v. Garcia,* 766 N.E.2d 341, 343 n. 3 (Ind.2002). Lake County explains that U.S. Steel's sales approach relied primarily on four bankruptcy sales of other steel plants, despite the fact that neither U.S. Steel nor the Gary Works was in bankruptcy on the assessment date, nor had they ever filed for bankruptcy.[9] Thus, claims Lake County, the bankruptcy sales are incomparable, unreliable, and inadmissible; as a result, Lake County maintains that U.S. Steel's second calculation fails to comply with generally recognized appraisal standards. (Pet'r Br. at 48–49 (citation omitted).) The Indiana Board disagreed— and appropriately so.

In its final determination, the Indiana Board found that U.S. Steel provided extensive, uncontradicted evidence regarding the bleak state of the steel industry at the time of assessment. Specifically, it found that increased foreign competition, excess product in the marketplace, and reduced consumer demand (especially from the automotive industry) all contributed to the drastic reduction in product pricing; furthermore, operating costs were increasing due in part to more stringent environmental regulations. (*See* Cert. Admin. R., Vol. 5 at 1369–77; Vol. 6 at 2036–41.) In turn, this economic climate led to large

---

8. Indeed, this Court has already held that the method comports with generally recognized appraisal techniques. *See Canal Square Ltd. P'ship v. State Bd. of Tax Comm'rs,* 694 N.E.2d 801, 805–06 (Ind. Tax Ct.1998).

9. From 1999 through 2001, however, the Gary Works experienced significant operating losses. (Cert. Admin. R., Vol. 2 at 633.)

financial losses and bankruptcies among steel-making companies in general; furthermore, between 2001 and 2004, five of the seven integrated steel companies in the United States filed for bankruptcy protection. (Cert. Admin. R., Vol. 5 at 1373; Vol. 6 at 2037.) Quite simply, bankruptcy was the industry norm, not the exception. (Cert. Admin. R., Vol. 6 at 2052.) In light of this evidence, the Indiana Board determined that the bankruptcy sales were reliable indicators as to U.S. Steel's property value.

This determination does not, as Lake County asserts, constitute an "unsupported legal proposition." (*See* Pet'r Reply Br. at 10 (arguing that U.S. Steel never cited "a single case supporting the proposition that bankruptcy sales may form the basis of an assessment or [ ] that reliance [there-]on ... is consistent with sound appraisal practice").) First of all, many jurisdictions ascribe to the theory that bankruptcy sales can be reliable indicators of property value. Indeed, in a fairly recent decision, the Oregon Tax Court, Magistrate's Division, stated:

> bankruptcy sales [are not typically used] in [ ] determinations of value. However, there is an exception to that general rule. The exception occurs when sales out of bankruptcy come to be a majority of the market. There are good reasons for that choice. Although an isolated bankruptcy may reflect a failed business plan, a remarkable string of bankruptcies is more likely to be the result of an obsolescence that reaches all properties within an industry. Under those circumstances the choice [ ] is not to dis-

miss the sales out of bankruptcy as reflecting atypical considerations, but to instead examine the transactions to see if they are reliable indicators of market value.

*Port of Umatilla v. Dep't of Revenue*, Nos. TC–MD 991438A, 010032A, 011214A, 2004 WL 367952 at *7 (Or.Tax Magistrate Div. Feb.24, 2004) (internal citation omitted). *See also, e.g., Great Lakes Div. of Nat'l Steel Corp. v. City of Ecorse*, 227 Mich. App. 379, 576 N.W.2d 667, 679 (1998); *Wadena Saw Mills v. County of Wadena*, Nos. C5–92–236, C3–92–235, 1993 WL 512388 at *2 (Minn.Tax Dec.8, 1993). Second, and perhaps more importantly, Lake County's blanket assertion that the bankruptcy sales cannot be used as comparables goes to the weight of U.S. Steel's evidence, not its admissibility. As such, Lake County's assertion is without merit. *See Freudenberg–NOK Gen. P'ship v. State Bd. of Tax Comm'rs*, 715 N.E.2d 1026, 1030 (Ind. Tax Ct.1999) (stating generally that in its review of Indiana Board final determinations, the Court will not reweigh evidence nor will it judge the credibility of witnesses, as those decisions are best left for the administrative decision maker) (citations omitted), *review denied.*

To the extent that the Indiana Board determined that U.S. Steel's presentation of bankruptcy sales were instructive in shedding light on the value of U.S. Steel's property—and to the extent that no binding authority holds otherwise—the Indiana Board did not abuse its discretion. The Indiana Board's final determination with respect to this issue is therefore AFFIRMED.[10]

---

**10.** Lake County also complains that while the Indiana Board relied on the bankruptcy sales in this case, it rejected the use of bankruptcy sales as comparables in a 2005 final determination issued in another case. (*See* Pet'r Br. at 49–50.) Based on a review of that final determination, however, it appears to the Court that the Indiana Board did not hold that bankruptcy sales could never be used; rather, the Indiana Board held that based on the particular factual situation presented in

## IV. Whether Calculation # 1–C Negated U.S. Steel's Claim for Obsolescence

■ At the Indiana Board hearing, U.S. Steel claimed that the state of the steel-making industry at the time of assessment (*see supra* discussion under Issue III) created economic obsolescence in its property. In Calculation # 1–C, it quantified that obsolescence by first calculating the "business enterprise value" of its property. (*See* Cert. Admin. R., Vol. 5 at 1406–17.) *See also* Appraisal Institute, THE APPRAISAL OF REAL ESTATE 641–44 (12th ed.2001) (stating that a property's business enterprise value not only reflects the value of the real property components themselves, but what investors are willing to pay for the "total assets of the business"). Prior to the Indiana Board hearing, however, U.S. Steel's appraisers discovered that they had inadvertently used understated revenue figures to calculate the business enterprise value of the Gary Works. (*See* Cert. Admin. R., Vol. 6 at 2010–12.) Using the corrected revenue figures, Calculation # 1–C indicated zero economic obsolescence. (*See* Cert. Admin. R., Vol. 6 at 2104–05.)

In its final determination, the Indiana Board held that U.S. Steel had nonetheless prima facie demonstrated the existence of economic obsolescence in its property. It noted that while Calculation # 1–C indicated zero economic obsolescence, U.S. Steel presented a second quantification of economic obsolescence—using generally recognized appraisal techniques—in Calculation # 2. (*See* Cert. Admin. R., Vol. 1 ¶¶ 166–80 at 500–02.) As a result, the Indiana Board awarded U.S. Steel a "reconciled" amount of economic obsolescence. (*See* Cert. Admin. R., Vol. 1 ¶¶ 216–18 at 508.) Lake County now argues that the Indiana Board erred in doing so: Calculation # 1–C should have indicated to the

Indiana Board that U.S. Steel was not entitled to an economic obsolescence adjustment at all and that U.S. Steel's overall assessed value should be "much, much greater than the $90,000,000[.]" (Pet'r Br. at 51.) Lake County's argument, however, fails.

Essentially, Lake County is, again, requesting the Court to reweigh the evidence. Indeed, the Indiana Board determined that despite Calculation # 1–C's quantification, Calculation # 2 still carried some weight. Lake County simply disagrees with how the Indiana Board distributed the weight, asserting instead that Calculation # 1–C should be given all the weight and Calculation # 2 none whatsoever. Nevertheless, this Court will not redistribute the weight in order to tip the scales in Lake County's favor. *See Freudenberg–NOK*, 715 N.E.2d at 1030. The Indiana Board's final determination with respect to this issue is therefore AFFIRMED.

## V. Reducing U.S. Steel's Land Value to Account for Environmental Contamination

Finally, the Indiana Board indicated in its final determination that it applied a negative influence factor to U.S. Steel's land assessment to account for contamination present in the portion of the Grand Calumet River that ran through its property. Lake County contends this was improper. Lake County is correct.

An influence factor is "a multiplier that is applied to the value of land to account for characteristics ... of [that] land that are peculiar to that parcel. The factor may be positive or negative and is expressed as a percentage." 50 IND. ADMIN. CODE 2.2–4–1(12) (2001) (repealed 2002). *See also* 50 IND. ADMIN. CODE 2.2–4–

that case, the bankruptcy sales were not the most reliable indicators of value.

17(c)(8) (2001) (repealed 2002). An influence factor is used to reflect one of seven conditions peculiar to the land in question. *See* 50 I.A.C. 2.2–4–17(c)(8); 50 Ind. Admin.Code 2.2–4–10(a)(9)(A)–(G) (2001) (categorizing influence factors by the conditions of "topography," "under-improved," "excess frontage," "shape or size," "misimprovement," "restrictions," or "other") (repealed 2002).

■ A taxpayer who seeks to have a negative influence factor applied to its land must submit, during the administrative hearing, probative evidence that (1) identifies its land's deviation from the norm and (2) quantifies the impact of that deviation on the land's value. *See Talesnick v. State Bd. of Tax Comm'rs*, 756 N.E.2d 1104, 1108 (Ind. Tax Ct.2001). To quantify the impact of a deviation on land's value, a taxpayer may, again, use market data.[11] *See Phelps Dodge v. State Bd. of Tax Comm'rs*, 705 N.E.2d 1099, 1106 (Ind. Tax Ct.1999), *review denied* (footnote added).

During the Indiana Board hearing, U.S. Steel presented evidence indicating that the presence of environmental contamination could warrant the application of a negative influence factor. (Cert. Admin. R., Vol. 7 at 2684–85.) US Steel also presented evidence indicating that, as of the March 1, 2001 assessment date, the portion of the Grand Calumet River that ran through its property suffered from environmental contamination and that it (U.S. Steel) had accrued, and subsequently spent, a significant amount of money to remediate that contamination. (*See* Cert. Admin. R., Vol. 5 at 1388, 1390, 1396–97; Vol. 6 at 2202–04.) In turn, U.S. Steel's appraiser, Harold "Skip" Perry, testified that given the state of the steel industry in 2001, the amount U.S. Steel spent in its remediation "would [have been] on the table in negotiations [between U.S. Steel and] a willing and knowledgeable buyer." (Cert. Admin. R., Vol. 6 at 2186–91, 2205.)

Based on this evidence, the Indiana Board concluded that, as a matter of law, U.S. Steel was entitled to a negative influence factor: US Steel made a prima facie showing as to the existence of environmental contamination and quantified it by demonstrating what it spent for the contamination's remediation. (*See* Cert. Admin. R., Vol. 1 ¶¶ 38–40 at 477–78.) The Indiana Board's conclusion, however, missed the mark.

■ US Steel's evidence does not show a causal link between the contamination and an actual reduction in property value equivalent to what it spent. Rather, U.S. Steel merely concluded that spending that money to remediate the contamination necessarily equated to an equivalent reduction in property value. This, however, is nothing more than a mere opinion or conclusion, and "a mere opinion or conclusion does not constitute probative evidence." *Talesnick*, 756 N.E.2d at 1108 n. 7. Consequently, U.S. Steel did not make a prima facie case that it was entitled to a negative influence factor.[12] *See id.* at 1108

11. In 2001, Indiana's assessment regulations provided that land was to be valued through the application of county land orders. *See, e.g.,* 50 Ind. Admin. Code 2.2–2–1(c) (2001) (repealed 2002). The county land orders provided base rates for all land within each county; the base rates were based on comparable sales (i.e., market value) data. *See* 50 Ind. Admin. Code 2.2–4–5, –17 (2001) (repealed 2002). Thus, "because the regulations describing Land Orders and influence factors specifically refer to market concepts ... the use of market concepts ... is a permissible means of quantifying influence factors[.]" *Phelps Dodge v. State Bd. of Tax Comm'rs*, 705 N.E.2d 1099, 1106 n. 14 (Ind. Tax Ct.1999), *review denied.*

12. Furthermore, the Indiana Board did not convert the purported "quantification" to an appropriate percentage factor. *See* 50 Ind. Admin. Code 2.2–4–1(12) (2001) (stating that

(footnote added). The Indiana Board's final determination with respect to this issue is therefore REVERSED.[13,14]

## CONCLUSION

For the foregoing reasons, the Indiana Board's final determination with respect to Issues I, III, and IV are AFFIRMED. The Indiana Board's final determination with respect to Issues II and V, however, are REVERSED. The matter is REMANDED to the Indiana Board to make adjustments to U.S. Steel's 2001 real property assessment consistent with this opinion.

an influence factor is "a *multiplier* that is applied to the value of land to account for characteristics ... of [that] land that are peculiar to that parcel. The factor may be positive or negative and is expressed as a *percentage*" (emphases added) (repealed 2002). Instead, it merely reduced the land assessment by the amount U.S. Steel spent on the remediation.

13. The Court is mindful of the fact that, in 2001, Indiana's assessment regulations did not provide a method by which to value environmentally contaminated property. Nevertheless, many techniques were being used in other jurisdictions to quantify the effect of contamination on a property's value. *See, e.g.,* OR. ADMIN. R. 150–308.205–(E) (2001) (requiring assessors to apply the sales comparison, cost, and income approaches to value contaminated land); *Westling v. County of Mille Lacs,* 543 N.W.2d 91, 93 (Minn.1996) (accepting valuation of property where evidence of comparable properties established its market value less the value resulting from stigma and the present value of the anticipated cleanup costs); *Garvey Elevators, Inc. v. Adams County Bd. of Equalization,* 261 Neb. 130, 621 N.W.2d 518, 527–28 (2001) (affirming property's value in use even though the

cost of remediation exceeded nominal unencumbered value of the property); *Inmar Assoc. v. Borough of Carlstadt,* 112 N.J. 593, 549 A.2d 38, 44 (1988) (holding that the value of contaminated land for tax purposes cannot be determined by simply deducting the cost of the cleanup from the putative value of the property and suggesting that contaminated properties be assessed as "special purpose" properties); *Commerce Holding Corp. v. Bd. of Assessors of Town of Babylon,* 88 N.Y.2d 724, 649 N.Y.S.2d 932, 673 N.E.2d 127, 128–29 (1996) (affirming income capitalization method combined with sales comparison approach for land only); ARIZONA DEP'T OF REVENUE, CONTAMINATED PROPERTY VALUATION GUIDELINE 2, 7 (1998) (noting that the sales comparison, cost, income, and value in use approaches all may be used to value contaminated property).

14. Prior to the administrative hearing, U.S. Steel and Lake County presented the Indiana Board with a stipulation as to the value of U.S. Steel's land "prior to adjustments upward or downward, if any, to account for influence factors applicable to the property." (Cert. Admin. R., Vol. 8 at 3267–68.) As a result of the Court's ruling on this issue, that stipulated value is now the land's final assessed value.